## CURTIS PUB. CO. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Third Circuit.    March 2, 1921.)

No. 2511.

1. **Contracts ⚸169—Must be construed with reference to environment and circumstances.**

There can be no just construction of a contract, without an understanding of the general situation and the causes which led to the making of the contract.

2. **Monopolies ⚸17(2)—Prohibitions of Clayton Act limited to sales and leases.**

The provision of Clayton Act, § 3 (Comp. St. § 8835c), making it unlawful to lease or make a sale, or contract for sale, of goods on condition that the lessee or purchaser shall not deal in the goods of a competitor of the lessor or seller, is limited to contracts of lease or sale by the clear meaning of its terms, and especially in view of its purpose to make invalid certain contracts of lease or sale of patented articles which the Supreme Court had shortly before held to be valid.

3. **Monopolies ⚸17(2)—Contract appointing district agents for distribution of magazines held not a "sale" contract.**

A contract by a magazine publisher, whereby it appointed another as its agent in a limited district for the purpose of selling and distributing its magazines to retail dealers and to boys who sold at retail, the district agents not being required to purchase the magazines, but merely to receive and distribute them, and to pay the stipulated price for those which they did not return as unsold, is not a contract for sale of goods, so that the insertion of a clause therein forbidding such district agents to sell at wholesale the magazines of any other publisher without the consent of the principal did not violate the Clayton Act.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sale.]

4. **Monopolies ⚸17(2)—Requirement of indemnity cash deposit held not to make agency contract a sale.**

The provision of a contract appointing district agents for the wholesale distribution of magazines that the agents shall deposit with the publisher a cash sum as security for payment for the magazines distributed to them, which sum the publisher must account for to the district agent, and on which it must pay him interest, does not make the agency contract a contract for the sale of the magazines, within the provisions of the Clayton Act, since the deposit is merely a cash indemnity to secure the performance of the agent's agreement, and not a payment for the magazines shipped to him.

5. **Trade-marks and trade-names ⚸80½, New, vol. 8A Key-No. Series—Unfair competition, within Trade Commission Act, a judicial question.**

Under the Trade Commission Act (Comp. St. §§ 8836a–8836k), making unfair competition in interstate commerce unlawful, without defining unfair competition, the determination of whether the acts established amounted to unfair competition is a judicial question, as it long had been in remedial suits at law for damages and injunction suits to prevent unfair competition.

6. **Trade-marks and trade-names ⚸80½, New, vol. 8A Key-No. Series—Court's supervisory powers under Trade Commission Act included determination of unfair competition.**

Under the Trade Commission Act (Comp. St. §§ 8836a–8836k), giving to the Circuit Courts of Appeals supervisory powers over the decisions of the Trade Commission, but making the Commission's findings of facts

conclusive, the courts, in exercising their supervisory powers, can determine whether the facts established show unfair competition; the decision of that question by the Commission not being final.

**7. Trade-marks and trade-names ⬅⟶80½, New, vol. 8A Key-No. Series—Decision on unfair trade in private suit is persuasive in proceedings under Trade Commission Act.**

Where, pending proceedings before the Trade Commission to determine unfair competition, a private suit was instituted by competitors against the company whose methods were under investigation, to restrain those methods as unfair competition, the decision in that suit for the defendant company, though it was not conclusive in the proceedings before the Trade Commission or on review thereof, is to be considered by the supervisory court, with a view to avoiding conflicting holdings under substantially similar states of fact.

**8. Trade-marks and trade-names ⬅⟶80½, New, vol. 8A Key-No. Series—Court can consider proof not included in Trade Commission's findings.**

Under the Trade Commission Act (Comp. St. §§ 8836a–8836k), giving the Circuit Courts of Appeals power to review the decisions of the Trade Commission and to enter on the pleadings, testimony, and proceedings a decree, but providing that the Commission's findings of fact shall be conclusive, it is not only the province, but the duty, of the Circuit Court of Appeals to review the entire testimony, and to base its decree, not only on the facts found by the Commission, but also on those established by the testimony on which the Commission made no findings.

**9. Trade-marks and trade-names ⬅⟶80½, New, vol. 8A Key-No. Series—Restrictive clause in contract with magazine distributing agents held not unfair.**

Where a magazine publisher had built up an extensive circulation by the employment of schoolboys as salesmen, and an essential element of the system was the use of district agents, appointed to receive the magazines from the publisher and distribute them to the boy salesmen, and to recruit and train the boys, the insertion in the contract appointing such district agents of a clause prohibiting them from wholesaling other magazines without the written consent of the publisher, which clause had never been enforced, except against two competing publishers, who had endeavored to reap the benefit of the first publisher's organization by inducing its district agents to distribute the competing magazines to the boys, was not unfair competition, and cannot be prohibited by the Federal Trade Commission under the Trade Commission Act.

**10. Trade-marks and trade-names ⬅⟶80½—New, vol. 8A Key-No. Series—Evidence held not to show restriction of competitors.**

Evidence introduced before the Trade Commission that there was a magazine distributing agency, through whom the competitors of the publisher whose practices were under investigation could distribute their periodicals to all retail dealers throughout the country, shows that the clause in the contract appointing district agents which restricted such agents from wholesaling competing magazines without the consent of the appointing publisher did not prevent the distribution of the competing magazines.

**11. Trade-marks and trade-names ⬅⟶80½, New, vol. 8A Key-No. Series—Question of monopoly important in determining unfair competition.**

Freedom of access by competitors to the consumer and entire absence of monopoly is an important element in the decision of cases of alleged unfair competition, under the Federal Trade Commission Act (Comp. St. §§ 8836a–8836k).

**12. Injunction ⬅⟶9—Doubt as to right may authorize refusal.**

Injunction is so drastic and prohibitive a remedy, and its issuance by a court of equity so carefully safeguarded, that to have substantial doubt of the wisdom of its issue often suffices to withhold it.

**13. Trade-marks and trade-names ☞80½, New, vol. 8A Key-No. Series—Supervision of Trade Commission exercised as other reviewing powers.**

The power given the Circuit Court of Appeals to supervise the injunctive orders of the Trade Commission was intended to be exercised as those courts had been accustomed to exercise their reviewing power over injunctions by lower courts.

Petition by the Curtis Publishing Company against the Federal Trade Commission to review an order of the Commission requiring petitioner to desist from certain practices found by the Commission to be unfair competition. Order of Commission set aside.

Prichard, Saul, Bayard & Evans, of Philadelphia, Pa., and Joseph W. Welsh, John G. Milburn, and John G. Milburn, Jr., all of New York City, for plaintiff.

Claude R. Porter and James M. Brinson, both of Washington, D. C., and Joseph A. Burdeau, of New York City, for defendant. ·

Before BUFFINGTON and WOOLLEY, Circuit Judges, and MORRIS, District Judge.

BUFFINGTON, Circuit Judge. On July 5, 1917, the Federal Trade Commission issued a complaint against the Curtis Publishing Company, alleging that it had used unfair methods of competition in interstate commerce in violation of section 5 of the Act of Congress of September 26, 1914 (Comp. St. § 8836e), and had also violated the provisions of section 3 of the Act of Congress of October 15, 1914, commonly known as the Clayton Act (Comp. St. § 8835c). This was followed by an amended complaint on the 8th day of April, 1918. The Curtis Company answered these complaints, and thereafter a large amount of testimony was taken, to which we will hereafter refer. On the 21st day of July, 1919, the Trade Commission made its findings of fact, and from these findings drew the conclusion:

"That the method of competition set forth in paragraph 2 of said findings is, under the circumstances therein set forth, in violation of the provisions of section 5 of an Act of Congress approved September 26, 1914, entitled 'An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes,' and that the acts and conduct set forth in paragraph 3 of said findings are, under the circumstances therein set forth, in violation of the provisions of section 3 of an act of Congress approved October 15, 1914, entitled 'An act to supplement existing laws against unlawful restraints and monopolies, and for other purposes.' "

The same day the Commission issued a restraining order on the Curtis Company to desist from continuing such alleged unfair method of competition. Thereupon the Curtis Publishing Company brought this proceeding to obtain a review of such order.

The Act of September 26, 1914, constituting the Trade Commission, provides as follows:

"Sec. 5. That unfair methods of competition in commerce are hereby declared unlawful. * * * Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition in commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or cor-

poration a complaint stating its charges in that respect.  *  *  *  The testimony in any such proceeding shall be reduced to· writing and filed in the office of the Commission. If upon such hearing the Commission shall be of the opinion· that the method of competition in question is prohibited by this act, it shall make a report in writing in which it shall state its findings as to the facts, and shall issue and cause to be served on such person, partnership, ·or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition.  *  *  *  If such person, partnership, or corporation fails or neglects to obey such order of the Commission while the same is in effect, the Commission may apply to the ·Circuit Court of Appeals of the United States, within any circuit where the method of competition in question was used or where such person, partnership, ·or corporation resides or carries on business, for the enforcement of its order, and shall certify and file with its application· a transcript of the entire record in the proceeding, including all the testimony taken and the report and order of the Commission. Upon such filing of the application and transcript the ·court shall cause notice thereof to be served upon such person, partnership, or ·corporation and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript a de- ·cree affirming, modifying, or setting aside the order of the Commission. The findings of the Commission as to the facts, if supported by testimony, shall be ·conclusive.  *  *  *  Any party required by such order of the Commission to cease and desist from using such method of competition may obtain a review of such order in said Circuit Court of Appeals by filing in the court a written petition praying that the order of the Commission be set aside. A copy of such petition shall be forthwith served upon the Commission, and thereupon the Commission forthwith shall certify and file in the court a transcript of the record as hereinbefore provided. Upon the filing of the transcript the court shall have the same jurisdiction to affirm, set aside, or modify the order of the Commission as in the case of an application by the Commission for the enforcement of its order, and the findings of the Commission as to the facts, if supported by testimony, shall in like manner be conclusive."

In pursuance of the last provision of the statute quoted above, the Curtis Company by this proceeding seeks a review of the Commission's order, which order, together with the Commission's findings of fact and the conclusion drawn therefrom, are printed at length ·in the margin.[1] An examination of these findings of fact shows that

[1] "Paragraph 1. That the respondent, Curtis Publishing Company, is a corporation organized and existing under and by virtue of the laws of the state of Pennsylvania, having its principal office and place of business in the city ·of Philadelphia, state of Pennsylvania, and is now, and was at all times hereinafter mentioned, and for many months prior thereto, engaged in the publication, sale and distribution of weekly and monthly periodicals, in commerce among the several states and territories of the United States and the District of Columbia.

"Paragraph 2. That in the course of such commerce the respondent has entered into contracts with certain persons, partnerships or corporations *to sell* ·or distribute its magazines, by the terms of which ·contracts such persons, partnerships or corporations, have agreed, among other things, not to 'act as agent for or supply at wholesale rates any periodicals other than those published by the publisher,' the respondent herein, without the written consent of such publisher; that of such persons, partnerships or corporations approximately four hundred forty-seven (447), hereinafter referred to as 'deal- ·ers,' are and previous to entering into such contracts with respondent were regularly engaged in the business of wholesale dealers in newspapers or magazines, or·both, and as such are as aforesaid engaged in the sale or distribution ·of magazines, or newspapers, or both, of other publishers; that many of said :four hundred forty-seven (447) dealers, and many others who have become

no findings whatever have been made in reference to the greater part of the vast volume of testimony in this case, and it therefore becomes the duty of this court, with a view to giving due effect to such testimony, to here recite what the proofs disclose as to the operations of the defendant company in those matters in which there has been no finding of fact by the Commission. And indeed, in our opinion,

such wholesale dealers since entering into such contracts, bound by said contract provision as aforesaid, have requested respondent's permission to engage also in the sale or distribution of *certain publications* competing in the course of said commerce with those of respondent, which permission as to said competing publications has been *uniformly denied by respondent*; that in enforcing said contract provision as to said dealers, and in denying them said permission, respondent has prevented and now prevents certain of its competitors from utilizing established channels for the general distribution or sale of magazines or newspapers, or both, of different and sundry publishers; that such established channels are in most instances the principal and most efficient, and in numerous cases, the *only medium* for the distribution of such publications in the various localities of the United States; that such method of competition so employed by respondent in the course of such commerce, as aforesaid, has proved and is unfair.

"Paragraph Three. That in the course of such commerce the respondent has made sales of its magazines to or entered into contracts for *the sale* of the same with certain persons, partnerships or corporations, by the terms of which sales or contracts for such sales such persons, partnerships or corporations have agreed, among other things, not to 'act as agent for or supply at wholesale rates, any periodicals other than those published by the publisher,' the respondent herein, without the written consent of such publisher; that of such persons, partnerships or corporations approximately four hundred forty-seven (447), hereinafter referred to as 'dealers,' are, and previous to entering into such contracts with respondent were, regularly engaged in the business of wholesale dealers in newspapers or magazines, and as such are engaged in the sale or distribution of magazines or newspapers, or both, of other publishers; that many of said four hundred forty-seven (447) dealers, and many others who have become such wholesale dealers since entering into such contracts, bound by said contract provision hereinabove referred to, have requested respondent's permission to also engage in the sale or distribution of certain publications competing in the course of said commerce with those of respondent, which permission as to said competing publications has been uniformly denied; that in enforcing said contract provision as to said dealers, and in denying them said permission, respondent has prevented and now prevents *certain of its competitors* from utilizing established channels for the general distribution or sale of magazines or newspapers, or both, of different and sundry publishers; that such established channels are in most instances the principal and most efficient, and, in numerous cases, the only medium for the distribution of such publications in the various localities throughout the United States; that the effect of said contract provision has been, and is, to substantially lessen competition with respondent's magazines, and tends to create for the respondent a monopoly in the business of publishing magazines of the character of those published by respondent.

"Conclusions.—From the foregoing findings, the Commission concludes that the method of competition set forth in paragraph 2 of said findings is, *under the circumstances therein set forth*, in violation of the provisions of section 5 of an act of Congress approved September 26, 1914, entitled 'An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes,' and that the acts and conduct set forth in paragraph 3 of said findings are, under the circumstances therein set forth, in violation of the provisions of section 3 of an act of Congress approved October 15, 1914, entitled 'An act to supplement existing laws against unlawful restraints and monopolies, and for other purposes.' "

such an examination and the ascertainment of the facts of such prior business dealings of the respondent company, is absolutely essential to a full understanding and a just determination of this case. Accordingly to the facts deducible from such testimony this court now addresses itself.

The Curtis Publishing Company is a corporation of the state of Pennsylvania. It was organized in 1883 with a capital of $2,500,000, which has since been increased to $25,000,000. Its business was the publication of periodicals, and from its incorporation until about 1897 that business was the publication of the Ladies Home Journal. In 1897 it acquired the Saturday Evening Post, and in 1911 the Country Gentleman. The Journal was a monthly publication; the other two, weekly. From 1883 to 1909, with the exception of a brief period of an experiment of circulation in 1906 through wholesalers, the Curtis Company distributed for these 26 years the Home Journal by mail and through the American News Company, the business of which latter company was the circulation and sale of newspapers and magazines through the United States. The arrangement between the Curtis Company and the News Company was one of a distributive agent and not of sale, the undistributed copies being returned to the Curtis Company by the News Company. The Curtis Company distributed the Saturday Evening Post by the same method for some two years after its acquisition, but in the latter part of 1899 it began to sell and circulate that publication by the addition of schoolboy agents to its selling staff; and in that connection we here note that, while the attempted use by some of the competitors of the Curtis Company of these schoolboys as the agency of magazine sale and personal delivery to customers is the end which these competitors have in view, yet, as the means of such control of the schoolboys, the vital, strategic factor underlying this controversy is the use and control of the distributing agents later referred to, who furnished the magazines to the boys, and who are the operative and vital connecting and controlling link between the schoolboys and the Curtis Company.

These combined agencies of the American News Company and the schoolboys organized by the Curtis Company were both employed by the Curtis Company for some 10 years thereafter. During this time the new schoolboy organization had grown to such extensive size, and had been so successful, that in 1910 the Curtis Company wholly discontinued its prior status of distributive agency with the American News Company, and thereafter its relation with the News Company was that of sale only, instead of agency; the News Company not having the right to return unsold periodicals to the Curtis Company. At that time the Curtis Company began also contracting with and sending its publications to independent wholesalers throughout the country, who were not related to, or connected with, the American News Company.

In addition to its contracts with the American News Company and the wholesale dealers in newspapers and magazines in the various cities and towns of the United States, the Curtis Company has also made contracts with persons and concerns who had not previously been engaged in the sale or distribution of periodicals, for distribution

through boys. The number of wholesale distributors of all kinds under contract with the Curtis Company was, by the testimony, shown to be 1,535.

The schoolboy selling organization of the Curtis Publishing Company was started by that company in 1899. At that time, as we have said, practically all magazines and periodicals were distributed through the American News Company. The Curtis Company, when it acquired the Saturday Evening Post, which was a weekly publication, conceived the idea of increasing its circulation through schoolboys. The success of the plan in selling the Post was such that it was extended to the Home Journal and the Country Gentleman. At first, these boy salesmen got their copies, not through local distributing agents, but direct from the Curtis Company in Philadelphia. But as their number grew it was found difficult to deal directly with them from the home office, and the Curtis Company therefore appointed district distributing agents in various localities, whose duty it was to distribute the periodicals to the boys, and who were likewise charged with the duty of recruiting and supervising the boys themselves. These distributing agents, largely drawn from the ranks of the schoolboy salesmen, are, as we have said, the permanent keystones and pivotal and controlling factor in the whole plan, for the schoolboy salesmen being, in the nature of things, a temporary and changing body, they must be constantly recruited, and this recruiting the distributing agents do. The distributing organization as a whole has been developed and is being carried on at large expense. At the present time it consists approximately of 1,500 district agents, having supervision of some 35,000 boy salesmen, and the organization is kept up at an expense of about $1,500.000 a year, and it is the principal agency employed by the Curtis Company in distributing its periodicals, and without control and undivided loyalty of which its business would materially suffer.

The proofs show that the circulation of the Post increased very rapidly with the use of these schoolboy salesmen, but that this was only brought about by the overcoming of many difficulties and the expenditure of large sums of money, and the education, so to speak, of the boys and their parents, and eventually by the use of local distributing agents, who, on the ground, did the work the Curtis Company originally did from the home office. The development of the system is set forth in the testimony of M. E. Douglas, as follows:

"Q. Did you encounter any difficulties in circulating through boys the way you did? A. Yes.

"Q. What were some of them? A. We found a prejudice in the minds of the parents and others against the idea of having boys sell magazines in this way. They looked upon the work of selling magazines as being the same as the work done by newspaper boys selling newspapers on the streets. There was a prejudice against it. They considered the newsboy's work as blind alley work. We had to make our methods different and our plans different in order to win the co-operation of the parents and teachers and others, and that required long and arduous work and the expenditure of a good deal of money. We had to inject into our plan an educational context in order to win the convinced participation of parents in our plan, with respect to boys.

"Q. What other difficulties did you have? A. We found the boys fickle, and we had to devise various ways and means of retaining their interest and

their efforts. Our effort was almost entirely to get steady customers, whom the boys might serve regularly from week to week, and we, of course, had to teach the boys how to do this, and tell them how.

"Q. Did you secure the co-operation of the parents and the teachers of the boys you had selling the Saturday Evening Post? A. We did.

"Q. Was the Post in the beginning known throughout the country? A. It was not known west of the Alleghenies.

"Q. What was the character of the boys who were selling the Saturday Evening Post at the time you mentioned? A. Almost all home boys and schoolboys, who sold nothing but our magazines.

"Q. Explain the plan you had of selling copies of the Saturday Evening Post, through boys. A. As I stated, the boys sent in their remittances and orders to Philadelphia, and we mailed the copies back to the boys. Then, in order to carry out or in order to accomplish our plans, we had to make it possible for the boys to learn how to sell. We began printing leaflets and pamphlets and house organs, in which we placed suggestions for the guidance of the boys, telling them what to say about the publications—telling them what to say about the articles or features of the publications. We, in short, had almost to put into the mouths of boys what they should say about the articles in the magazines, and we had to help them to identify the class of readers to whom to go. We had to associate the particular article with the prospective purchaser in the mind of the boy, in order that he might judge how to intelligently approach the reader who would be most apt to buy the particular article or issue. That required a good deal of work, in addition to the other necessity of getting the convinced participation of the parents of the boys in this proposed plan.

"Q. How did you obtain the participation of the parents and teachers? A. We built up a circulation of 25,000 to 40,000, and then we found it difficult to make further increases. The increases that had been made up to that point did not follow, and we began to analyze the reasons for that, and we found that it was—

"Q. How did you obtain the participation of the parents and teachers that you spoke about? A. By emphasizing the business training value of this work and pointing out what was involved in it.

"Q. How was that done? A. By concrete illustrations as to what was involved in that.

"Q. Was that done by traveling men or correspondence? A. We began with a few traveling men, in about 1901, and we gradually increased the force, so that we had traveling men as well as correspondence helping to this end.

"Q. What educational feature was incorporated in your method? A. Eventually we worked out the plan of the League of Curtis Salesmen.

"Q. The what? A. The League of Curtis Salesmen.

"Q. What was that? A. A league composed of the organization of our better boys—the boy reaching the highest rank in the league is assured of a good salaried position obtained by us for him. There are several ranks in the league. This was the culmination of our effort at imparting the educational content to the parents.

"Q. That was the culmination of your effort that began in 1899 or 1900, when you first started to break down this prejudice of the parents and teachers? A. Yes, sir.

"Q. Which you testified about? A. Yes, sir.

"Q. Was there anything with respect to the vocational training of boys, other than you have testified, with respect to the instruction that you gave them? A. Oh, yes; we have used moving picture films, and we have had conventions—

"Q. I mean at that time. A. In the early time?

"Q. Yes. A. We emphasized points like this: 'Boys in connection with this work have opportunities to learn something about the keeping of accounts, because they have accounts to keep with their customers and with the district agent, and we emphasized the desirability of learning salesmanship, by reason of the fact that the vocation of salesmanship is one of those vocations having a large number of people employed in it—larger, in fact than all but three

or four other vocations, perhaps. For instance, bookkeeping—that is taught in almost every public school, yet there are several salesmen for each bookkeeper, and you hardly find salesmanship taught in any high school—at least not one in a thousand.

"Q. At that time, in 1899 and 1900, the boys were in direct contact—that is, the boys who were selling the Saturday Evening Post—were in direct contact with the main office of the Curtis Publishing Company in Philadelphia? A. Yes, sir.

"Q. Did you have any local agents at that time—in the beginning? A. Not in the beginning.

"Q. What gave rise to the appointment of local agents? Just briefly explain that, Mr. Douglas. A. We found need of local supervision.

"Q. Local supervision of the boys? A. Local supervision of the boys, yes, sir; in order to adapt it locally—to meet local conditions—the plans I have described. That is when we began appointing district agents.

"Q. When did you appoint the first district agent of the Curtis Publishing Company? A. The first district agent was appointed in about 1901.

"Q. Who was it? A. Beverly Roy Dudley, of Richmond, Va.

"Q. Was he a boy salesman? A. He had been a boy salesman.

"Q. He had been a boy salesman? A. Yes, sir.

"Q. He was the first district agent appointed? A. Yes, sir; the first district agent appointed.

"Q. Who was the next agent appointed? A. I think the next was Wallace Greenbaum, of Denver, Colo.

"Q. Had he been a boy—a Curtis boy? A. Yes, sir; he had been a Curtis boy.

"Q. Did you keep on appointing district agents after that, from time to time? A. We appointed a few, and watched them to see what developed, and, as excellent progress followed, then we began appointing other district agents, just as fast as we could, everywhere.

"Q. Have you any idea about how many you had after the first six months—just approximately? A. We probably worked for about three months with a dozen, to see what the developments were. Then, within six months after that, I should say we had a hundred or two.

"Q. What was the main reason for your appointing these district agents, and what were they supposed to do? A. *We wanted a representative locally—an agent locally—who would coach these boys and train them as salesmen. We wanted to shift, with respect to this effect, the center of gravity from Philadelphia to these cities, and have an agent there who would coach these boys and do the same things we were doing at Philadelphia.*

"Q. Did that involve meeting with the parents and teachers? A. Yes, sir; that involved meetings with the parents and teachers.

"Q. What did the agent have to do at that time with respect to making any reports? A. Very soon—in due course, after we had appointed a considerable number of them, so it became a practical thing, then we began to ask them to make reports of sales by boys individually. Of course, when we appointed one of those agents, we turned over to the agent all the boys in the town who had been previously buying from us, and asked them to buy from the district agent, thereby giving the district agent the local organization to start with, giving them the boys we had been previously supplying, and, as soon as it became a practical thing, we had these agents report to us the sales by the boys individually.

"Q. So, after 1901, which was the beginning of the employment of district agents, you testified, I think, that you put in more from time to time at various places? A. Just as fast as we could.

"Q. Now, at that time, how were the district agents located and found—selected? A. They were placed largely by correspondence, for the reason that in the early days we did not have an adequate force of men. We had applications from a number of the boys, asking for appointment. In our house organs, we made mention of the arrangements that had been made with district agents.

"Mr. Daly: What question is he answering?

"Mr. Welch: He is answering how the district agents were selected and found.

"The Witness: In our house organs we made mention of the arrangements that had been made with Beverly Roy Dudley, and with Wallace Greenbaum, and with others, and this resulted in applications coming to us from boys in other cities, who wanted similar arrangements made.

"Q. Did you have any traveling men appointed then? A. We had a few; yes. Then, as we found this plan proving successful, we advertised. We advertised for persons to act as agents for us.

"Q. And this was covering the period from 1901 up to about when? That is, it was a continuing period, after 1901? A. Continuing period, yes.

"Q. Now, what was the character of the men, other than boys, that were appointed district agents? A. Chiefly retail dealers.

"Q. Retail dealers in what? A. News dealers, stationers, book stores, druggists, tobacconists, candy stores occasionally—every kind of a retail store.

"Q. Did you endeavor at first to obtain as district agents one. of the boys who had been selling the Post? A. The preference was always given, under our original instructions, to one of the boys who had previously been selling, if there were one qualified for leadership of the others.

"Q. And, following that, your traveling men or you would appoint a retail dealer? A. *Some one qualified for leadership, chiefly retailers.*

"Q. And you kept on appointing—did you after that keep on appointing boys as district agents, wherever available? A. Yes; we still do so.

"Q. And still do it? A. Yes.

"Q. That is, boys who previously sold the Post and the Curtis publications? A. *Yes; there are thousands of boys, right now, looking forward to the time when they may get to be district agents.*

"Q. What did you do with respect to extending district agents or not? A. In about 1909, we began to use traveling men on a large scale, to appoint district agents in towns where we then had not appointed them."

From this it will be seen that the development of these district agents was a natural outgrowth of the commercial and fair development of the business; that the first district agent was appointed in 1901; that the first appointees were old boy salesmen; that on the district agents was placed the responsibility of personally dealing with the boys locally, instead of from the home office at Philadelphia; that beginning with a few such local distributing agents, the success of the movement developed rapidly; and, indeed, the very business of these distributing agents, which these two competing companies seek to share, namely, the boy force of these agents, was turned over to the agents originally by the Curtis Company itself.

As the plan of working through distributing district agents proved successful the Curtis Company began advertising for persons to act as distributing agents—"news dealers, stationers, book stores, druggists, tobacconists, candy stores, originally—every kind of a retail store." However, the preference was always given to one of the boys who had developed in the boy organization, and the extent of this preference for the boys was shown by the fact that, out of 1,700 or 1,800 distributing agents, the Curtis Company had had, in 1910, about 85 per cent. of boys and retail dealers. Indeed, the fact that from the boys there were being developed *trained* distributing agents, and that these distributing agents were *recruiting* new boys, shows how widespread and *correlated* the two factors were.

"Q. About how many district agents did the Curtis Publishing Company have in 1910, approximately, if you know now? A. About 1,700 or 1,800.

"Q. Did they have that many as early as 1910?  A. I think so.

"Q. You testified that most of these district agents, in 1910, were boys and retail dealers.  Can you give any estimate of what percentage were boys and retail dealers?  A. About 85 per cent."

This general plan seems to have been original with the Curtis Company, the proof being that "at that time there was no other publisher of magazines which circulated its magazines through local district agents supplied directly by the publisher and by the boys." It will thus be seen that in its novelty and success it was a new factor, within its sphere, of developing a new, and not of operating an old, field of commerce.

Up to 1910 the distributing district agents sold their publications direct to the boys only, and retail news dealers were supplied by the American News Company. Shortly before that time, owing to business friction between the Curtis Company and the American News Company, the district distributing agents were left free to deliver copies of the Evening Post to retailers, and this arrangement was later extended to the Ladies Home Journal. Up to the year 1910 the Curtis Company's district agents wholesaled no other magazines than the Curtis Company's Post and Ladies Home Journal, a business practice to which no one is shown to have objected as unfair business competition. The expense of maintaining these sales through the distributing district agents and the boys at large amounted in 1908 to over $250,000 and in 1909 to over $376,000.

In 1912, the Curtis Company acquired, as we have said, the Country Gentleman and distributed it through its distributing district agents and boys and through the American News Company in the same way, and from that time on has continued to expend large sums for prizes, etc., among its distributing agents and the boys, approximately the following sums: 1913, $89.000; 1914, $88,000; 1915, $126,000; 1916, $184,000; 1917, $136,000. The personal character of the work of the local distributing agents and the personal relation of these boys to the Curtis Company and its local distributing agents was shown by the proofs. As a part of the boys' compensation, the company paid the dues in the Y. M. C. A. of a large number of boys; these membership fees now amounting to $2,500 a year.

A league of what is called "Curtis Salesmen" was formed among the boys, membership in which was dependent on their *standing* in their local school work and on their *efficiency* as salesmen, both of which features it was the *work* of the local distributing agent to oversee. The boys reaching the highest rank in this league were assured good salaried positions on leaving school, and their high character and the success in training them is proved on the record by the fact that at the time the proofs were taken there were 2,000 applications on file from some of the best business concerns of the country, asking for these boys. The personal character of this work of the local distributing agents and the co-operation of the company's traveling agents, in the organization of this league of the boys, and the time, patience, and expenses expended in its formation, are fully set forth on the record, and show, beyond all question, that this widespread, novel, and effec-

tive selling organization of distributing agents and boy salesmen is a part of the complainant's business, fairly and laboriously built up by it, and leaves no doubt that its morale, efficiency, and good will was a business asset, and in the distribution of magazines of great value, and its continuance. and its success was, in the main, bottomed on the undivided loyalty of the local distributing agents and on their continuing to remain distributing agents of the Curtis Company alone.

The proofs show that the compensation of these boys and the distributing district agents was fair; taking, as an example, of the five cents paid by a customer to the boy for a copy of the Saturday Evening Post, two cents went to the boy, one-half of one cent to the distributing agent, and two and a half cents went to the Curtis Company for publishing and delivering the magazine to the district agent. Indeed, the personal character of the relationship and the distributing agents, as the prime element in the whole plan, is stated by Charles W. Eliot, late President of Harvard University, who says:

"The method of the Curtis Publishing Company in enlisting a large number of boys who are still at school in selling its publications, and teaching them how to sell the journals to the advantage of the company and to their own profit, gives a useful example of co-operation between schools and industrial companies in the training of boys. It is a first-rate example of vocational training, given by a commercial company during the period of school life. The Curtis. Publishing Company's method has proved successful in several important respects: First, it has provided the company with a large body of *effective young distributors* of its products; secondly, it has kept thousands. of boys in school longer than they would otherwise have stayed there; thirdly, it has taught them thrift and accurate accounting, an invaluable lesson; fourthly, it has given many thousands of boys a knowledge of the art of selling journals, which easily becomes available in many other businesses; fifthly, it places many boys in good situations on well-grounded recommendations, when, being fit for larger service, they leave the employ of the Curtis Publishing Company. The Curtis method has thus been of great service, not only to more than 50,000 boys, but also to employers in a large variety of industries. It should be clearly understood that boys who avail themselves energetically of the offers of the Curtis Publishing Company can still have half of their afternoons for play, and can earn by diligence out of school hours, not only their pocket money, but a considerable savings bank deposit in the course of four or five years. The winning of this deposit is likely to affect beneficially the whole future career."

The proofs show that 95 per cent. of these boys sell only the publications of the Curtis Company, and that, in view of their school duties and in deference to the wishes of their parents, the sales for the Curtis Company is the limit of their selling power, and if they sell other magazines they must cut down the Curtis sales. The proofs show that the Curtis Company expended in the maintenance of districts agents and boys in the four years, 1914 to 1917, both inclusive, over $5,500,-000, and they abundantly satisfy us that this method of distribution is an entity made up of the joint activity and personal co-operation of district distributing agents and boy distributors and their relationship to the Curtis Company, each one of the three being dependent upon the other two for the proper co-operating and interrelated distribution of the respondent's publications and promptly furnishing the same. to the reading public, and that this plan originated with, and was built.

up by, the Curtis Company through years of patient effort and at great expense, and that it forms the basic, practical method of distributing and marketing the Curtis Company's publications and is a business asset of great value, and that the vital and basic element in this business is the undivided loyalty and personal interest and influence of the distributing agents.

After the success of this plan had been demonstrated by the work and money of the Curtis Company, it is to be noted as an evidence of business morality among the magazine publishers that but 2 of the 400 magazine publishers made any effort to take away from the Curtis Company the undivided services of its distributing agents. And it will be further noted this effort was involved in and became the subject of judicial consideration in a suit hereinafter referred to. Pictorial Review Co. v. Curtis Publishing Co. (D. C.) 255 Fed. 209. There the court, in its opinion, held as to the relative conduct of those 2 competitors:

"The defendant, in insisting upon maintaining the integrity of its system, is not in my opinion guilty of unfair trade. On the contrary, the complainant, in attempting to avail itself of this system, is engaging in unfair trade. That it cannot build up a system of its own, if it desires to do so and will go to the trouble and expense, I do not believe. It is attempting here to secure a preliminary injunction to prevent the defendant from contracting with the latter's district agents not to market the Pictorial Review through boys and dealers. To grant such an injunction would break up what I think is a perfectly legitimate system for the promotion of sales of the defendant's magazines, and would enable the complainant, without expense, to employ the organization built up and fostered by the defendant."

Turning, then, to the proofs in regard to the acts of the Curtis Company and these two competitors which form the basis of this proceeding, we note that in 1910 the Success Company, which published the Post Magazine, now the National Post Magazine, endeavored to make use of the Curtis organization. But from 1912 to 1917 the services of the boys in the organization described have been utilized solely by the Curtis Company. During that time a number of other magazines and periodicals had been wholesaled to retail dealers by some 366 of respondent's district distributing agents, out of a total of 1,375. This has been done with the understanding that no use should be made of the respondent's boy organization for the sale of the periodicals of such publishers. The proofs further show that about 1917 the two magazine companies, which published the four magazines referred to, undertook to avail themselves of this boy organization of the Curtis Company. One of these companies was the Pictorial Review Company, which published the Pictorial Review; the other the Crowell Publishing Company, which publishes four magazines, namely, Women's Home Companion, American Magazine, Farm and Fireside, and Every Week. These companies have built up a great business and great circulation of their magazines through the American News Company and by other means open to them, as to which reference is made in the testimony of Messrs. Beck and MacKinnon.

As we have seen, the Pictorial Company depended entirely, in the matter of single copy sales, on the American News Company and

its facilities. Seeing this, they sought to secure the local distributing agents who are under contract with the Curtis Publishing Company, "in order to secure a wider and more efficient and better service and more circulation." The proofs show the commercial significance of this effort was that—

"If we could reach all of the wholesalers in the country—that is to say, if we could do business with all of them—I think the doubling of our *single copy* sales" (that is, a sale by boys) "would not be unreasonable to expect on Every Week."

In addition to the effort to reach the distributing agents of the Curtis Company, the proofs show that efforts were made to reach the boys whom the distributing agents had. At first no objections were made by the Curtis Company, in a number of cases, to its district distributing agents handling these periodicals:

"With Every Week, as with Pictorial, we granted permission in a number of early cases, until it developed that the methods in use were contemplated to be generally objectionable to us."

These later-developed methods, after February, 1917, are shown by the proofs that—

"In the case of Every Week we found that they were beginning to sell through boys."

The letters of the Pictorial Company, which began about January 20, 1917, and were sent to the distributing agents of the Curtis Company, among other things, stated:

"We are ready to supply you directly with such copies of Pictorial Review as you can sell through boys, * * * Your boys should be able to do a corking business."

In the specific instructions sent out to give these Curtis distributing agents, they were directed by the Pictorial Review to "get your boys busy getting orders for regular monthly delivery." That the purpose was to undermine the sale of the Home Journal by the Curtis Company's boys is clearly indicated in a circular dated November 28, 1917, in which they said:

"Maybe you have some newspaper or route boys whom you could get started with a monthly delivery by offering them this bonus in addition to their regular four cents."

Thus, the testimony of Smith, of Washington City, is that an agent of the Pictorial Company came to his office and—

"wanted me to take some copies from the Washington News Company, and get my boys who were selling the Saturday Evening Post and the Ladies' Home Journal to try them out."

The proofs further show that it was to be done in an underhand manner; the witness stating:

"Before I had a chance to refuse it, it was offered to me with the suggestion that I could get it in my sister-in-law's, or my wife's or in the name of a couple of men who worked around the office."

The proofs further show that Smith was a sales boy who had grown up with the Curtis Company sales agency, having started with that

company when he was eight years old. The proofs show that Thomas had about 350 boys selling for him, and that he had received about 200 from the Curtis people when the work was turned over to him; that he had meetings with the boys at the Y. M. C. A. and the boys' homes. Thomas testified that Korb asked him to handle the Pictorial. "He said he would accept; if the boys wanted any copies, to let them have them." Thomas had been brought from Norfolk and Newport News, where he had been working for the Curtis Company, to Baltimore, and had taken charge of their business there. It is also to be noted that, while Korb was endeavoring to get the use of these 350 boys through Thomas, the latter was not the only wholesaler in Baltimore; that Cann, Wilson, and Grape were wholesalers who handled the publications of other magazine publishers, and who, it is fair to conclude, were all competitors of the Curtis Company, could get their service.

The Curtis Company's district agent, Kimbrough, at Richmond, was also approached. He had been connected with the Curtis Company for seven years; had grown up as one of their boy salesmen; had worked into the position of district agent and handled no other magazines. There were other wholesalers in Richmond, the proofs show, namely, the Richmond News Company and Levy & Co.; but Kimbrough was asked to handle the Pictorial.

"They said they wanted to get away from the American News Company, and would turn their store business over to me, if I would permit the sales with the boys, and I said I would refer the matter to the Curtis Publishing Company.

"Q. Those are the only boys you have? A. Yes, sir.

"Q. You distribute magazines through these boys? A. Yes, sir; Curtis publications, and they handle only Curtis publications, as far as I know."

The suggestion was likewise made to him that he could take an agency for the Pictorial in somebody else's name.

The proofs show these boys form a dependable body; that they had their own permanent customers; and they also show the personal work of Kimbrough. In these respects the testimony of Kimbrough was:

"Q. Did you have any talk with Mr. Korb, or did Mr. Korb say anything to you, about other Curtis agents handling Pictorial Review? A. Yes; he said that there was no objection on the part of the company, because Smith, at Washington, and Schafer, at Pittsburgh, were handling the Pictorial Review.

"Q. Was anything said about your brother? A. He did suggest that I could do that.

"Q. What do you mean by 'could do that'? A. That I could have taken the agency in somebody else's name.

"Q. How many boys have you? A. Well, it runs on an average of around 100.

"Q. Are they a pretty permanent body? A. They keep at a pretty permanent figure of about 100. I have one boy who was selling before I was district agent, and he is still selling, and others come and go, and last two or three years or a few weeks, and that is about the way it works out.

"Q. They have permanent customers or routes? A. Yes, sir.

"Q. What kind of boys are they? Where do you get them? A. Most of them from school lists and advertisements inserted in the papers, asking for nice, clean boys.

"Q. Most of them are schoolboys? A. Yes, sir.

"Q. Have you done any work instructing them, or holding meetings with them? A. Yes, sir; I have held meetings with them, and often they come and ask me where they can get customers, and I tell them the best I know how.

"Q. And do you do some Y. M. C. A. work? A. We have meetings with the Y. M. C. A., and the Y. M. C. A. has co-operated with us and loaned us their swimming pool."

It appears from the testimony that, at the time Kimbrough was thus asked to take these agencies and have the boys do the selling, Levy was the main wholesaler in Richmond at that time; the seeming object not being to get a dealer to handle their magazines, but to get a Curtis distributing agent, who could use the Curtis boys.

The testimony in regard to the situation at Rochester, N. Y., is also indicative of the real purpose the Pictorial Company had in view. In that city the wholesalers were the Rochester News Company, which was a branch of the American News Company, and the Manson News Agency. They were old, well-established concerns. Lazarus, the district distributing agent of the Curtis Company, had been such for 14 years and sold no magazines except the Curtis publications. He had about 220 boys, and they had their own customers. The value of the personal character and the personal work of a distributing agent, as used in the Curtis plan, is shown in the testimony of Lazarus:

"Q. How long have you had your Curtis contract? A. About 13 or 14 years.

"Q. You sell your papers, I presume, to dealers and to boys? A. To dealers and to boys; yes, sir.

"Q. How many boys have you? A. I have about 220 boys that sell the Posts and the Journals, and about 30 or 35 corner boys.

"Q. Newsboys? A. Newsboys; sell Curtis magazines and papers, etc.

"Q. Of the 220, do any of them do any selling other than Curtis publications? A. No, sir.

"Q. They have their own customers? A. Own customers; yes.

"Q. What kind of boys are these? A. They are all good class of boys. Their fathers are lawyers, doctors, and business people.

"Q. You went out and got these boys? A. Yes, sir; I went out and got those boys.

"Q. How did you get them? A. I have different ways of getting boys—boys that sell for me. They bring them to me, and then again I am in a business place where there are 340 offices in it, all lawyers, doctors, and all class of peoples, and their sons sell for me. They tell their boys to sell. Once in a while we would be offered different ways of getting them, through newspapers. Curtis has a way of putting it in the papers, you know, getting boys, and it is easy to get boys any way.

"Q. You never have any trouble? A. Never have trouble getting boys at all; no sir.

"Q. Do you work with the Curtis Company, with their own men there, in getting them and keeping them efficient? A. Yes, sir; I do.

"Q. And you report on these boys every week, the results of their efforts, do you not? A. Every week; yes, sir.

"Q. Are any of these boys members of the Curtis League? A. Yes, sir; well, we have about four master salesmen and about three league salesmen.

"Q. Any plain league members? A. Yes, sir.

"Q. Have you got any expert salesmen of the middle class? A. We have got some, I think. I am not sure. I think I have.

"Q. If they sell enough papers, they get advanced in rank in the league? A. Yes, sir; get advanced in rank in the league.

"Q. Do you have any contact with their school-teachers? A. Yes, sir; I do.

"Q. What do you do? A. I know them all personally. They are glad to send boys to me.

"Q. You work with the school-teachers in getting boys? A. Yes, sir; work with the school-teachers in getting boys. Then we also have about 10 boys that I guess the Curtis Publishing Company paid their way through the Y. M. C. A.

"Q. And you work with the Y. M. C. A. there? A. Yes, sir.

"Q. Do you know whether the Curtis Company has done that? A. Yes, sir."

The same proposition was made to him that was made to the others, stating that they wanted him to handle the publications through the boys. Lazarus testified that he sells 7,000 Posts and 4,500 Ladies' Home Journals; that "he don't handle other business, because Curtis magazines keep him busy"; and that he gives it all his time.

In Louisville, Ky., the Heverin News Company was the large wholesaler. It was not a branch of the American News Company. It handled a large number of magazines and newspapers, and had been long in the business. Goodman had been the district distributing agent of the Curtis Company for only three years, and his business was exclusively for them. He distributed to 117 boys and to some 215 retail dealers. He testified that he had had the fullest co-operation of the Curtis Company in obtaining boys for his work, and that the Curtis Company was in personal correspondence with every one of them; that these boys were appointed by name by the Curtis Company; that they received prizes or bonuses from that company, and printed matter. He testified that for every new boy he started in the work he received from the Curtis Company $1. Goodman testified that a representative of the Crowell Publishing Company had endeavored to get him to sell their Every Week in Louisville.

"One of the road men, he was trying to place Every Week in Louisville. He approached me, and I explained the situation, that I did not care to handle it, and he finally asked me if I had any relative or any brother working for anybody in the newspaper business, and I told him I had a brother working in the Louisville post office, and he suggested I place the agency in his name.

"Q. In your brother's name? A. And have our Curtis boys sell it, and by doing so, the agency not being in my name, they would not find it out.

"Q. Now, the Crowell man, of course, wanted to do the same thing for the boys, too, did he not? A. He wanted the Curtis boys to sell Every Week.

"Q. And thus reach the same customers that the wholesale dealer could not deliver to? A. No; Every Week wanted to draw the benefit of the Curtis work.

"Q. I know he wanted to get the benefit of the Curtis organization, but he was trying to reach these customers, was he not? A. He was trying to have the boys sell Every Week to some of their Post customers."

The substantial character of Goodman's magazine business is shown by his sales of 4,700 Posts a week, 2,300 Journals, and 750 Country Gentlemen.

Proofs in reference to Topeka, Kan., clearly show that the boy organization was what the Crowell Company was after, and not the general wholesaler. In Topeka, one Patterson was a wholesaler and is now handling 15 magazines; Miss Goodrich handled the Curtis publications alone. The representative of the Crowell Company came to Topeka four different times, endeavoring to induce her to take on his magazines and obtain the use of the Curtis boys. Miss Goodrich distributed the Curtis publications to 33 dealers and had 170 boys. She was the clerk of a church, and took up the work with the boys as

a vocational, altruistic work. She had parents' meetings once a month, meetings of boys of the Y. M. C. A., had them organized in teams, and got in touch with their work in the schools. It was this organization that the Crowell agent wanted to avail himself of. Her testimony shows the personal nature of the work:

"Q. You are intimate with a number of the parents of these boys? A. Yes; we have had parents' meetings once a month. The *parents* are interested in what the plan is doing for the boys; in fact, the whole game with me is a vocational plan, anyhow, and what it is doing for the boy, and I am not only getting these boys, but the parents and teachers at the schools. I had one high school teacher who came to me and asked for viewpoints about salesmanship. Salesmanship is taught in the high school at home, and the lesson that day was 'Selling Saturday Evening Posts.' I had another teacher who came and asked us what we could do for a boy who was late at school. I said that should not be, and I just told her to announce that a boy who reported late at school would not receive his copies until after school. She has spoken to me several times since, and she said that boy has never been late since.

"Q. You are in this because of your great personal interest in this vocational work? A. I surely am. The agent said I have such a good organization it was not necessary to go farther, and that he had a good proposition and would like to leave it with me. I said I could not take on the other publications without the consent of the Curtis Publishing Company, and, besides, I did not want to use the boy organization, because it was strictly a Curtis organization."

Miss Goodrich sold substantially 2,000 Posts and 2,000 Journals of each issue. The existence of another competent wholesaler in Topeka, and the continued persistence of the Crowell Company in endeavoring to get the boy organization which Miss Goodrich, the Curtis distributing agent, had built up as a distinctly Curtis organization, shows that the boy organization was the crux and aim of the Crowell Company's efforts, and the key to getting it was getting the distributing agent.

The testimony of Mrs. Sturdevant shows very clearly the personal, altruistic, vocational character of the work of the boys in the Curtis organization; the personal work of the district distributing agent in building up the organization and of the Curtis Company in aiding in its up-building; and the desire of the competing company to avail itself of this boy agency created by the Curtis Company. Mrs. Sturdevant was a district distributing agent in St. Louis, a city of such magnitude that obviously these competing companies could each get a competent wholesaler to distribute its magazines. In the face of this fact, an effort was made to induce Mrs. Sturdevant to give them the services of the boys of this Curtis organization. Her testimony shows that she gained her training under Curtis branch managers, and, as she said, she "learned the Curtis ideals and Curtis methods." She had 187 boys, all of whom were schoolboys. "I make it my business to know the parents of the boys in almost all cases, and know them personally, through the boy, either over the phone or by visiting at their home." She kept in touch with the boards of schools and got information from them in regard to the boys' school standing, "because the company required that the boy must make good marks in school." She had her boys subdivided into ten club organizations, and at the meetings—

"We have instruction on the selling features of the particular publication for that special week. We talk about the cover (of the Curtis publication), analyze it, and discover whether the cover is a good selling feature; whether the cover will sell the copy, or whether we must refer to something inside."

The work of the district distributing agent with the boys is supplemented by the traveling representative of the Curtis Company. The proofs show:

"Men came there at times for special efforts to get boys. Mr. McLarty, and last year Mr. Neer and Mr. Wehner, different Curtis representatives, came there. Then the company makes very special efforts themselves, by making prize offers to the boys."

As showing the personal character of the work in this organization, the same witness testified:

"Q. Now, during these six years' experience, during the time you were district agent, you had experience in watching these boys and instructing them? A. Yes.

"Q. Would you say that it had been beneficial to the boys as a whole? A. Oh, I know it.

"Q. Well, is there any particular respect that you could speak about in which it has benefited the boys? A. There is a boy (indicating picture) that I had from the time that he was a small boy, and this boy now is a bank examiner. * * * In the eighth grade, when he got about 14, his mother began to have trouble with him. She is a widowed mother. She appealed to me. So I took it up with Elmer, and got him to be a member of the League of Curtis Salesmen, promising him that if he would make certain sales he could do it. I kept him from quitting school, and I kept him from losing his grades, because the *company required that the boy must make good marks in school.* So I appealed to Elmer in that way, and through the principal of his school, Mr. R. L. Barton, and his mother and grandmother and Mr. Barton, we all worked together and showed him what it would mean to him to do this. And then, when he got out of school, he got a position in the Mechanics' American National Bank. I went to see Mr. Allen about three or four months afterward, and he said, 'If you have any more boys like that, send them to me and I will take them.' * * * Very much benefited. I have a small boy who is the son of a widowed mother, and he only sold five copies when he began, and was exceedingly stupid. I took it up with his mother. He could not keep account of his money at all. So she called me up and asked me if I thought Robert had better quit. I said, 'By all means, no; let me have him three months more.' He could not make change; in fact, he very seldom got home with as much money as he started out with for a while, and his mother considered it a bad investment. But his mother and I together have been very busy, and we co-operated with him. At the present time, at the last call his mother made on me in regard to it, she said, 'Robert is able now to go out and deliver all his copies'—he is taking ten copies now—'and to come in with the entire amount of cash, and he can make change.' He is only eight years old.

"Q. How old is Robert? A. Eight years old. And his mother has persisted in it, even at the loss of money, for the sake of principle and the boy, and she helps him keep his accounts every week. I had another boy, Douglas Crockwell. His father is in the wholesale leather business. And Douglas' father had had me teach his boy. He is not selling now, on account of the condition of his health. And his father told me that he makes Douglas account for every cent of his profits. Every week they go over the book that the gentleman showed here.

"Q. Yes? A. And they figure his profit, and a certain amount is laid away for spending money, and a certain amount is put aside in a permanent fund, and the father and Douglas attempt to account for every cent that is earned in prize money and bonuses and everything else."

We quote these things at length, not as showing the altruistic character of the organization, its worth to the boys, or as being a factor in the decision of this case, but simply to show that, whatever the boy sales agency of the Curtis Company was, the distributing agents and their undivided service to the Curtis Company constituted the foundation stone of the whole selling structure.

Mrs. Sturdevant handled no other than the Curtis publications. She was urged to take on Every Week by the Crowell Company, but declined. She felt that the boys were doing better work by concentrating on one publication; that, if she took on another publication, she would have to teach them the selling points of that publication, and that their parents did not want them to do so; that she placed no restrictions on the boys selling other magazines, where their customers wanted them to furnish them; that she finds that about 50 Posts is as much as a boy ought to handle; `that she had not encouraged them to sell more.

The personal character and morale of the district agents and the boys are illustrated by the testimony of these witnesses:

"Q. Now, you are interested in your boys making all the money they can, aren't you? A. I am more interested in their learning to be men, business men.

"Q. Yes, I will agree in your case that is true; I think you are. A. Yes, sir.

"Q. And I think it is a very commendable thing. A. I do not emphasize the money as much as the other.

"Q. But I am asking you, would you like to have them make money, too? A. Oh, yes; the money is the measure of success in a way."

Mrs. Sturdevant declined to take on other magazines, saying:

"Well, I believe in the boys concentrating on one thing. I believe in concentration. I think it pays me and pays the boys. I believe that to handle one line of goods and handle it well is better than to divide up."

Mrs. Whittelsey, another district agent in St. Louis, had 35 boys on her staff, and handled no other publications than the Curtis. She was also approached with a view to get the use of her organization of Curtis boys:

"In August, 1917, I was asked to—a man came to the house. He told me he was representing Pictorial Review, and asked me if I would take it on. I said, 'No'; that I was not interested and I hadn't time. Well, he said it would not take any more time than I was devoting right now to it; that I had the organization, and could do it while I was distributing the other papers.

"Q. Did he mention the character of your organization in any way? A. Yes; he said they were a fine class of boys, and they could sell the papers while they were selling the other papers."

The testimony shows that the effort to get the distributing district agents' boys of this Curtis organization was carried out even in small communities. McNerney was a miner at Goldfield, Colo., and there was a wholesale news company and a branch of the American News Company in that district, which wholesaled every magazine that came into it except Curtis', which was the only one McNerney handled. He had a small organization of boys, which he had built up and

trained with the help of the Curtis Company, through their prizes and instructions. The personal character of the organization, distributing agent, and boys, and its relation to the Curtis Company, is shown by his testimony:

"Q. How did you come to sell Curtis magazines? A. Well, I was going to school and needed a little spending money, and I knew the district agent in Cripple Creek, and he thought he would give me a trial, and started me out with 20 Posts.

"Q. Did he give them to you, or sell them to you? A. He sold them to me.

"Q. Twenty Posts a week? A. That was the first week.

"Q. And when you bought those 20 Posts, and started to sell them, did you know you were a Curtis boy? A. Yes, sir.

"Q. How did you know that? A. Because he told me."

The testimony of Nelson, district agent at Omaha, shows clearly that the object in view was to get hold of the Curtis schoolboy organization. In that city, both the American News Company and McLaughlin, a wholesaler, handled magazines. Nelson had 135 boys, and handled nothing but the Curtis publications, which took up his entire time. The proofs show that his boys were schoolboys; that the traveling representatives of the Curtis Company had aided him in instructing them and taking the general supervision of their work; that the boys had received special encouragement from the Curtis Company; "I have one boy that won a trip for him and his mother to Washington for the inauguration of President Wilson, and also at the same time won a pony and cart and harness;" that other boys had won smaller amounts, and he himself had obtained bonuses on account of the work done as distributing agent, the largest being a check for $500; and that during the 16 years of his connection with the Curtis work he had earned bonuses approximating $2,000. He was urged to take up Every Week.

"The substance of their interview with me was that they wanted to get in with the boy organization, which I would not sanction, and that seemed to be about all there was to it."

The thoroughness with which this work of obtaining the use of the Curtis organization of boys was carried on is evidenced by the testimony of Dewey, a 16 year old schoolboy, who, in addition to his school work, had 10 boys selling Posts; the contract being carried in his father's name. The proofs show that the Crowell Company visited him, but the witness declined to handle the magazines, because they "were in direct competition with the Curtis magazines, and I did not want to work them together."

The testimony of Alexander McLean is very suggestive. His son started out, as a boy of 12 years of age, to sell the Curtis publications. He made such a success of it that they gave him a certain district, and after he had had that for 4 or 5 years the company proposed to McLean to take the entire North Side in connection with his son. The father gives an account of the training the son had from the Curtis Company in his work. He says:

"The most beneficial thing that ever happened to him. It has made a business man of him. The boy is now worth, as a boy 22 years old, he is worth probably $10,000. He has made all of that with the Curtis publications, with

the investments he has made of that money. And then he has got 375 boys; he is making business men the same way, practically out of all of them. They save their money; and the boy that don't save his money, he is no good at all. He might just as well turn him out. If the mother and the father don't take care of him, or both of them—it is the best business training for the child that has ever been put before the public, I don't care what it is.  *  *  * He is worth probably $10,000 himself. Now, he has made that off of the Curtis people, and the investment he has made of the money he has made off of that. In other words, it has made a business man of him. I will take his word—it is personal, of course; it is my son—it has made a business man of him, that I will put him against any business man in the city of Chicago. That is what it has done for him.

"Q. You attribute that to his training as a Post boy?  A. Yes, sir; the training that they have given, and what they are doing right now with every Curtis boy they have got. That is what it has done for them, always has done for them, and will do with them.

"Q. What is it they are doing now, with respect to the Curtis boys you have now?  A. They give them free copies to start with. They give them all the encouragement they can in the way of teaching them how to sell goods and approach men, and go out and teach them how to save their money and what to do with their money. It is nothing but business training. It is not a little, quibbling business, either. The boys come to our place, and they buy them, and they sell them, just like they would in any other business. It is just as big business for these boys as Marshall Field's business is for him, and done the same way. The Curtis people furnish little books, and I have got one right here (indicating). It is as simple a set of books as you can usually find—teaches them how to keep books. These little children, 10 and 14, are taught just as well how to keep their accounts, just as well as Marshall Field's and the First National Bank, or anybody else, and the Curtis people have been doing that for years, as I know positively.

"Q. And these boys are also instructed right along in the proper methods of selling?  A. They certainly are.

"Q. And in keeping their accounts?  A. They certainly are.

"Q. And approaching—  A. Approaching people.

"Q. —prospective customers?  A. Yes, sir.

"Q. The merits of the article, and so forth?  A. These little, bashful boys will start that business, and it makes them self-assertive; they can put a proposition to a man just as well as a man can, and sometimes better. I will take these boys that have been trained under these Curtis Publishing Company systems of training, and I will put them against men in our stores, and find them better, and we have 350 boys.

"Q. What is the class of the 350 boys?  A. They are the best class that you can get; mostly schoolboys, naturally. They devote their half day, and one day, and may be two days to selling the Post. That is, the right kind of a boy, if he is drawing 50, he will stick to it until he sells them. If he is the wrong kind of a boy, he will bring most of them back. That is the kind of a boy we try to push along and teach him how to do it."

The proofs show that McLean and his son had 350 boys in their organization. While they allowed their boys to sell other publications occasionally, they did not encourage them, for the reason that a divided allegiance would destroy the efficiency of the organization. In that regard McLean testifies:

"As a business proposition, you cannot do two things, and do them practically alike. You are going to neglect one or the other. If they sell the Curtis Publishing Company's things and somebody else's they are going to neglect one or the other."

From these proofs on the subject-matter of which the Commission made no findings whatever, it appears by the undisputed testimony

that the Curtis Company through a series of years, at large expense, and by the creation of personal relations, had built up both a distributing and a selling organization that was efficient, personal in character, and that was—substantially—engaged in distributing and selling exclusively the Curtis Company's publications; that with a view to having this organization cease being the exclusive agents of the Curtis Company, and with a view to enlisting the schoolboy salesmen of the Curtis organization, the Pictorial Company and the Crowell Company began and carried on a widespread and systematic campaign, with the object of obtaining the service primarily of the district distributing agents and secondarily of the local boy salesmen of the Curtis Company. The proofs show that, in most localities where this attempt to get the distributing district agents of the Curtis Company to handle their publications was made, there were other wholesale distributors already employed in distributing other magazines, and through whom these two companies could have distributed their own. The proof, by those experienced in getting these periodicals—and there is no proof to the contrary—is that this boy organization is composed almost wholly of schoolboys, that the time at their disposal and their capacity to sell is limited, and that the ordinary limit of a boy's selling capacity is about 50 magazines; that, if the boy undertook to sell other publications, it would result in diminishing his sales of the Curtis publications, as these two firms are in competition with those of the Curtis Company, and the handling of the two publications by the same boy would destroy the morale and efficiency of the Curtis boy organization.

Such being the proven and undisputed facts, and the commercial gain to these two competing companies, if they had succeeded in their plan, being to break down an efficient selling organization which the Curtis Company had, through a long term of years, at great expense, and with much effort built up, the crucial question arises: Was the insertion by the Curtis Company in its contract with its distributing agents that without the written consent of the Curtis Company its distributing district agents "will not * * * act as agent for or supply at wholesale rates any periodicals other than those published by the publisher," evidence of unfair competition in business; or, stated in the common business thought of those in that branch of commerce, is it evidence of unfair business in magazine publishing to have an exclusive distributing agent? And, indeed, the question of unfair business is even narrower, when the test of unfair business is applied to what was actually done in this case; for, while the restrictive wording of the contract was broad in scope and covered all magazines and all publishers, yet in its practical enforcement it was only enforced against these 2 competitive firms, and was not enforced against some 400 other publishers and magazines who used the services of such agents in a fair commercial way and did nothing to undermine the loyalty, efficiency, and personal relation of these exclusive agents to their principal.

[1] Having thus considered the general situation which led to the making of these contracts, and without an understanding of environ-

ment and the causes which led to the making of a contract, there can be no just construction of a contract, let us now turn to the question of the violation of the Clayton Act.

In this regard, we note that paragraph 3 of the Commission's findings, which finds:

"The defendant has made sales of its magazines to, or entered into contracts for the *sale of the same* with, certain persons, partnerships or corporations, by the terms of which sales, or contracts for such sales, such persons, partnerships, or corporations have agreed, among other things, not to act as agents for, or supply at wholesale rates, any periodicals other than those published by the publisher," the respondent herein, without the written consent of "such publisher"

—was addressed to the Clayton Act. That act provides that it should be unlawful for one engaged in commerce—

"to lease or make a sale on contract for sale of goods, * * * on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods * * * of a competitor * * * of the lessor or seller," etc.

Seeing, then, that a lease or sale is the thing forbidden by the Clayton Act, that in this case the alleged sale was made by written contract, and that this written contract of sale was the unlawful contract which the Commission forbade the Curtis Company to enforce, it is apparent that the first and basic question in the case must be directed to an examination of this written contract and a determining whether it is one for the sale of goods, etc., for, if it is not for a sale, the requirements of the Clayton Act, namely, "a sale or contract of sale," do not appear in this written contract, and therefore, no sale being shown in the record, it is the duty of the reviewing court to vacate an order to desist from violating the Clayton Act. So far, therefore, as the Clayton Act is concerned, the questions involved in the present case are: First, is the Clayton Act limited to sales on contracts for sales of goods? and, second, was the present contract one of sale?

The question of sale being the significant and controlling factor in the third finding, and that being determined, our next question would concern the second finding, which is the same, in substance, as the third finding, with the additional element that such written contract was alleged to be in the alternative, either for sale or *distribution*; and the next question, therefore, would be: Does the making and enforcement of the foregoing contract, whether it be a contract of sale or distribution, constitute unfair competition in business?

[2] Turning to the first question, let us determine whether the quoted clause of the Clayton Act is limited to sales or contracts of sales. The only answer to this is the act itself. Its words are "to lease or make a sale or contract for sale." It makes unlawful conditions, agreements, or understandings—

"that the lessee or purchaser thereof shall not use or deal in the goods * * * of a competitor or competitors of the lessor or seller."

The words "lease," "sale," "contract for sale," "lessee," and "purchaser," being the words used, and no other relation than lease and sale being mentioned, there is no expressed purpose in the clause quoted to make it cover any other subject than leases, sales, or contracts

for sales, and to embrace no other persons than lessees and purchasers. The words are so clear they require no construction, and to needlessly construe, in order to broaden the scope of the statute, whether done by the Trade Commission in administering, or by this court in supervising the administration of, the statute, would be for either or both such agencies to write into the statute what Congress has not expressly written. Not only has no ground been shown for contending that by necessary implication the statute covered other subjects than leases, sales, contracts for sales, or other persons than lessees and purchasers, but the Supreme Court had in Motion Picture Patents Co. v. Universal Film, 243 U. S. 518, 37 Sup. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959, quoted below, indicated its view that the clause in question was passed to meet a clearly defined controversy which concerned leases and sales. The case of Henry v. Dick, 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880, involved the sale of a patented machine, and the decision upheld a sales condition that other than supplies made by the seller should not be used in its operation by the buyer. Such being the adjudged law of the land, the Supreme Court, in Motion Picture Patents Co. v. Universal Film, 243 U. S. 518, 37 Sup. Ct. 421 (61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959) not only overruled that case but changed the decided law, saying:

"It is obvious that the conclusions arrived at in this opinion are such that the decision in Henry v. Dick Co., 224 U. S. 1, must be regarded as overruled."

But in doing so that court suggested, as we have said, its view that Congress, in passing the quoted section of the Clayton Act, had done so in order to meet the decision in Henry v. Dick, supra; the opinion stating:

"We are confirmed in the conclusion which we are announcing by the fact that since the decision of Henry v. Dick Co., 224 U. S. 1, the Congress of the United States, the source of all rights under patents, as if in response to that decision, has enacted a law making it unlawful for any person engaged in interstate commerce 'to lease or make a sale or contract for sale of goods * * * machinery, supplies or other commodities, *whether patented or unpatented*, for use, consumption or resale, * * * or fix a price charged therefor * * * on the condition, agreement or understanding that the lessee or purchaser thereof shall not use * * * the goods, * * * machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.' 38 Stat. 730."

And in that connection it will be noted that in the dissenting opinion in Henry v. Dick (see 224 U. S. 50, 32 Sup. Ct. 381, 56 L. Ed. 645, Ann. Cas. 1913D, 880) the Chief Justice, with two Justices concurring, suggested the very congressional action which, we submit, was afterwards embodied in the Clayton Act, stating that their dissent would—

"serve to make it clear that if evils arise their continuance will not be caused by the interpretation now given to the statute, but will result from the inaction of the legislative department in failing to amend the statute so as to avoid such evils."

That, shortly after this decision was rendered, Congress passed the clause in question, gives additional weight to the view that Congress—

"as if in response to that decision, has enacted a law making it unlawful for any person engaged in interstate commerce 'to lease or make a sale or contract for sale of goods,'" etc.

[3] Seeing, then, that the interstate commerce acts made unlawful by the Clayton Act were limited to the lease and sale of goods, we turn to the second question, namely: Did the present contract "lease or make a sale or contract for the sale of goods"? We say "present contract," for as that contract is the one now used, and whose future use is the practical commercial factor involved, we pass by all the preceding contracts, and confine ourselves to the one on which the Curtis Company stands as the assertion of its lawful right to contract with its distributing agents. Turning, then, to this present contract of the Curtis Company, which is Exhibit D of its answer, and the pertinent parts of which are printed in the margin,[2] we note, first that the agreement, which is entitled a "District Agency Agreement," is in form and verbiage an appointment by a publisher of an agent, and

[2] To appoint the said party of the second part as district agent　*　*　*

"2. To supply the district agent with copies of the Saturday Evening Post and of the Country Gentleman at two and one-half cents (2½¢) each, and of the Ladies' Home Journal at nine and three-quarters cents (9¾¢) each, transportation charges prepaid, provided that if the district agent fail to prove himself entitled to the wholesale rates by wholesaling each publication to subagents, and by sending on time, the required fully itemized, subagents' sales reports, or if the district agent fail to maintain a net sale of his quota of *any one* publication, as required by clause 8, the publishers may then charge three cents a copy for the Saturday Evening Post and for the Country Gentleman and eleven cents a copy for the Ladies' Home Journal, or may, at their option, terminate the contract after thirty days' notice and appropriate the cash security;

"3. To give credit to the district agent, as the price paid, for unsold copies returned *in accordance with the regulations governing returns, as stated on the order blanks last issued by the company;*　*　*　*

"8. To sell at least ―――― copies of each issue of the Saturday Evening Post, at least ―――― copies of each issue of the Ladies' Home Journal, and at least ―――― copies of each issue of the Country Gentleman;

"9. To supply subagents, both boys and dealers, with the Saturday Evening Post and the Country Gentleman at three cents a copy for resale at five cents a copy, and with the Ladies' Home Journal at eleven cents a copy for resale at fifteen cents a copy, and to make deliveries early on the morning of the sale date;

"10. To refrain from displaying, delivering or selling any copies to boys, dealers or retail customers *before* the authorized sale date, as specified on the printed order blank furnished by the publishers;

"11. To refrain from selling any copies in any territory known to be controlled by another agent under contract;　*　*　*

"13. To refrain hereafter from wholesaling to boys or dealers (and from attempting to influence any Curtis agent to sell) any periodicals other than those published by the Curtis Publishing Company, and to refrain from furnishing any other publisher or his agent with the names and addresses of any Curtis agents, without first obtaining the approval of the publishers;　*　*　*

"16. To permit the publishers to retain, throughout the life of this agreement, possession of the $―――― herewith remitted by the district agent as cash security for his performance of his several obligations hereunder."

an agent for limited territory and for a mutually optional time, for the purpose of (a) selling and (b) distributing its magazines. Now, there are no words in the contract which purport or contemplate the sale of such magazines, and there is express provision, if (a) a sale, or (b) a distribution, to third parties, is not effected. the magazines consigned are to be returned to the publisher. Indeed, the nature of the transaction, the necessary haste to get the magazines into the hands of the boys at once, shows of itself that there was no reason for transferring title by sale. It was not the handling of commodities of which sales would naturally be made. It was a contract for distributing and speeding up deliveries of an article whose whole value depended on the haste with which it passed from the agent's possession. Confirming these statements, we note that in clause 1, "appoint the said second party as district agent for the Saturday Evening Post," etc., are words aptly used in constituting an agency, viz. "appoint," and of restricted territory, "district agent."

We note that clause 3 provides for the return and credit, at consignment prices, of unsold copies, and that clause 5 provides for the payment of interest at 5 per cent. on the money deposit, made by the agent, as security for the magazines consigned. As to the agent making sales of the magazine, clause 8 obligates him to sell a certain number of copies of the magazine, and clause 9 binds him to deliver the magazine to dealers and boys "early on the morning of the sale date" and at certain specified prices. We also note that, by clause 10, the agent binds himself not to display, distribute, or sell any of the magazines before an authorized sale date, and by clause 11 not to sell any copies in territory controlled by another agent. All of these and other details that might be cited evidence that the relation created by this contract, and by its expressed terms meant to be created, was one of agency, and that there is an entire absence in the contract of any terms or words usual or requisite to effecting or evidencing a sale, as well as of circumstances inviting or necessitating a sale.

[4] We have not overlooked the fact that the contract provides for the maintenance by the agent in the hands of the publisher of an advance sum of money sufficient to indemnify the publisher for all magazines forwarded. But in our judgment this deposit cannot, in view of the right of return, be regarded as a payment, but rather as an indemnity to secure payment, for all copies the agent does not return. It is a fund on which the publisher is obliged to pay a substantial interest rate. It is an indemnity, and the fact that such indemnity is in money, instead of a bond or obligation to pay money, is of no significance, and the crucial question still remains: Is the contract which it indemnifies one of sale to a buyer, or consignment to an agent, for subsequent sales or distribution? It is, moreover, an indemnity fund for which the Curtis Company is bound to account to the agent. Nor is the accounting price of the magazines even fixed by the contract. It depends on the future efficiency of the agent. Nor is the fact to be overlooked that the contract, taken as a whole, could not be satisfied by the mere fact of sale to a buyer, for, if the transaction ended with a sale by the publisher, the whole spirit and purpose of the contract

would be lost, which is that the distributing agent should distribute to the boys and the boys distribute to their personal customers.

The subject of the contract is a large quantity of magazines, and the object of the contract is not to vest ownership of them in the other party to the contract, but to pass those magazines by the use of other agencies into the hands of the public. And the object of placing these magazines in the hands of the public is not alone to get from the real buyer of the magazine its comparatively small price, but by placing it in the hands of a vast number of buyers to thereby enable the publisher to obtain that advertising patronage which is the financial mainstay of all such periodical publications. It has therefore seemed to us that the unique character of the subject-matter of this contract, the object the publisher had in view, and the phraseology, conditions, and obligations of this contract, unite to make the contract one of consignment to a distributing agent, who was furthering the business of his principals, and not one of a buyer, who thereby acquires title for his own individual purposes.

Such being the case, we hold the Commission erred in the legal construction of this contract, and therefore had no proof before it to find, as it did in its third finding, that "the respondent has made *sales* of its magazines to, or entered into contract for the *sale* of the same, with certain persons," etc., and therefore its legal conclusion from such findings, viz. "that the acts and conduct set forth in paragraph 3 of said findings are, under the circumstances therein set forth, in violation of the provisions of section 3" of the Clayton Act, was in error, as was also the part of its decree which enforced such conclusion.

[5] Having thus found that the distributive agency contract was not a violation of the Clayton Act, we next turn to the third question, namely: Does the making and enforcing of that contract, whether it be a contract of sale or distribution, constitute unfair competition in business? What is unfair competition in business? Now, while Congress has enacted, as we have seen, "that unfair methods of competition in commerce are declared unlawful," it has not defined unfair competition, or specified what shall constitute unfair competition. From this absence of definition, it is reasonable to infer that it was in the mind of Congress that, as unfair competition had long been a subject of judicial scrutiny, determination, and was involved in remedial suits at law for damages and of injunctive suits in equity, to prevent continuance, the definition and ascertainment of what constituted unfair competition was a legal question which the law could determine. Indeed, in the nature of things, it was impossible to describe and define in advance just what constituted unfair competition, and in the final analysis it became a question of law, after the facts were ascertained, whether such facts constitute unfair competition in business, for the test of fairness, as of fraud, is the application by the law of moral standards to the actions of men.

While it was the exclusive right of a jury in a case at law to find the facts in any given case, it still remained the duty of the trial judge, before entering judgment, to decide whether from those facts the

injury of unfair competition in business could be lawfully inferred. So, also, when the case was in equity, while it was the province of the judge to find the facts, it also was his duty, and as well the duty of a reviewing court, to decide whether, upon those facts so found, the injury of unfair competition in business existed. Presumably, with this recognized existing jurisdiction of federal courts over cases of unfair business competition in mind, Congress passed the Trade Commission Act, the pertinent parts of which we have heretofore noted in the margin.

[6] Such, then, being the existing and by the act unchanged jurisdiction of such courts in reference to questions of unfair competition between business competitors generally, and that jurisdiction being exercised on well-established legal principles, it follows that, when Congress invoked an exercise of supervisory power on the part of such courts over the action of the Trade Commission, and enacted that this supervisory power should be exercised before the orders of the Trade Commission could be enforced, it would seem to follow that the supervisory powers which the court was meant and intended to exercise were the usual powers exercised in the usual way by those courts when exercising their power to review, and, while the act provided that the findings of fact made by the Commission were final and conclusive, it still remained the duty of the supervising court to determine the same legal questions which a supervising court had in reviewing actions of the trial court, namely, whether under all the facts found by the Trade Commission a case of unfair business competition was established. That Congress meant to invoke some supervisory power precedent to the Trade Commission enforcing its orders is apparent, and unless that invoked jurisdiction meant in effect to submit to the judgment of the Circuit Court of Appeals the legal question whether the facts found by the Commission established that the competition was by the judgment of law unfair, and if that supervisory power did not charge the Circuit Court of Appeals with the legal duty of judicially deciding whether the facts found were such as warranted injunctive relief by the Commission, we may well ask the question: What supervisory power did Congress intend should be exercised by the Courts of Appeals? For, if such supervisory power, which is one of substance and judicial in its nature, is not to be exercised by that court, then it is manifest that the supervisory power which Congress invoked was one of mere shadow and not of substance.

To our mind, the situation is wholly different from that of the Interstate Commerce Commission. There the basic question is the fixation of rates, which is a question of business discretion, and in no sense a legal, judicial, or moral one. Manifestly, Congress did not mean to confer upon the Trade Commission the power to grant injunctions in cases of business competition, where courts would not be justified in granting injunctions. Indeed, when Congress, in invoking such reviewing and supervisory power, said "the court * * * shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to make and enter *upon the pleadings, testimony and proceedings* set forth in such transcript, a

decree affirming, modifying or setting aside the order of the Commission," it was using language which aptly described the customary jurisdiction and power theretofore exercised by Circuit Courts of Appeals in reviewing cases of alleged unfair business competition.

Such, then, being the supervisory jurisdiction conferred on this court, we turn to the question before us and inquire whether the record as a whole, which includes, not only the findings of fact made by the Commission, but also the proofs in regard to which the Commission made no findings, disclose a case of unfair business competition on the part of the Curtis Company, which warrants a decree which in effect enjoins them from successfully continuing a distributing and selling agency they have utilized for years.

[7] Before taking up that question, we note the fact that, while this proceeding was pending before the Trade Commission, the Pictorial Review Company invoked the jurisdiction of the United States District Court for the Southern District of New York, by a bill filed against the Curtis Publishing Company, to enjoin unfair business competition. That court, in an opinion reported at 255 Fed. 208, said:

"What complainant evidently desires is, not merely to sell to these wholesalers, which it can do already in cases where the wholesalers have a retail trade, and to the extent of that retail trade, but to avail itself of the organization of the Curtis boys, built up by the ingenuity, labor, and capital of the defendant. The defendant, in insisting upon maintaining the integrity of its system, is not in my opinion guilty of unfair trade. On the contrary, the complainant, in attempting to avail itself of this system, is engaging in unfair trade. That it cannot build up a system of its own, if it desires to do so and will go to the trouble and expense, I do not believe. It is attempting here to secure a preliminary injunction to prevent the defendant from contracting with the latter's district agents not to market the Pictorial Review through boys and dealers. To grant such an injunction would break up what I think is a perfectly legitimate system for the promotion of sales of the defendant's magazines, and would enable the complainant, without expense, to employ the organization built up and fostered by the defendant."

An examination of that case shows that, upon facts which in no wise controverted the fact findings of the Commission heretofore set forth, that court held the Curtis Company's course did not constitute unfair business competition. We see no reason to differ from the conclusion reached by that court, and, unappealed from as it is, it judicially and finally adjudged that as between these companies the Curtis Company has not been guilty of unfair competition in business. And such matter being as between these parties finally adjudged, two things follow: First, the competition of the Curtis Company is adjudged not unfair; and, second, no court could thereafter, in a suit between these parties, issue an injunction to enjoin such competition.

Of course, the decree in that case, where private rights only are concerned, binds only the parties, and can in no way affect the jurisdiction of the Trade Commission; but the fact that while the business relations of these parties were under review by the Commission one of the parties invoked, as it had a right to do, the jurisdiction of a court in equity and sought to enjoin such alleged unfair competition, and that court, after hearing, held that the defendant's business operations did

not constitute unfair competition, but, on the contrary, the complainant's actions did, and the Trade Commission thereafter, upon similar facts shown to it, held the Curtis Company was guilty of unfair competition in business, the mere existence of such an anomalous and contradictory holding of legal conclusion upon the same general facts in and of itself suggests that, in the exercise of our reviewing, supervisory, jurisdiction, it is for us to decide whether the legal question before the Trade Commission was rightly decided by it, and in deciding that question we may give due consideration to the reasoning and opinion of the court referred to, with a view to avoiding conflicting holdings under substantially similar states of fact.

[8] But, before taking up that question, let us make it clear that we are not violating, or in any way ignoring, the statutory limitation on our supervisory reviewing jurisdiction, namely, "that the finding of facts, if supported by testimony, shall be conclusive." The findings of fact by the Trade Commission we have quoted in full. Those findings we accept as established, and they are the sole foundation on which the order of the Commission is bottomed. "From the foregoing findings, the Commission concludes," is its own statement.

But the case did not turn on this restricted phase, which, in our judgment, totally ignores the real situation, and makes no finding on those facts which are really determinative of the question whether the competition of the Curtis Company was unfair business competition. That real situation, as we have seen from the uncontradicted proof, among other features, consists of, first, the creation, through years, with great effort and large expense, of the Curtis Company's schoolboy selling organization; second, that the district distributing agents constitute the control, morale, recruiting, and existence of the schoolboy selling organization; third, the efforts of two competitors to appropriate that selling agency to themselves, with the undisputed consequence of undermining its morale and destroying its efficiency; and, lastly, that the purpose of the Curtis Company in putting in its contract the clauses objected to was not to interfere with commerce, or with the circulation of the 400 magazines, but solely to thwart the unfair plan of 2 unfair competitors, who sought to undermine the undivided loyalty of the Curtis distributing district agents, and through them disrupting the Curtis school boy organizations.

Now, it is very apparent that, where the supervisory review by the Circuit Court of Appeals, which Congress invoked, provided that that court "shall have power to make and enter *upon the pleadings, testimony and proceedings* set forth in such transcript, a decree," it is the province, and indeed the duty, of the reviewing court, to consider, not merely the findings of the Commission, but the whole record, the whole proofs, and the whole proceeding, and to say, first, whether, in view of all the proofs, the limited facts found by the Commission really passed on the pertinent and decisive facts, and so warranted an injunction; and, second, if such limited facts do not reach the merits, and do not alone legally justify and warrant a decree of unfair competition and injunctive relief, then, since Congress has enacted that the Circuit

Courts of Appeals "shall make and enter *upon the pleadings, testimony and proceedings* set forth in such transcript, a decree affirming, modifying or setting aside the order of the Commission," it is quite clear that it is not only the province, but the duty, of the Circuit Court of Appeals, and indeed the expressed purpose of Congress that such reviewing court should itself examine the pleadings, the entire testimony and proceedings, and upon such inclusive examination determine whether the facts found by the Commission and the proofs on which the Commission made no findings, and which the court, in the absence of such finding, itself finds and determines, legally established a case of unfair business competition by the Curtis Company.

[9] Taking, therefore, the record, proofs, and pleadings as a whole, we hold as a legal and judicial conclusion that the proofs are not such as can support a judgment or decree of unfair competition on the part of the Curtis Company toward the Pictorial Company and the Crowell Company. That company legitimately, and in course of fair business dealing, built up and recruits by its distributing district agents a selling agency of schoolboys, the whole efficiency of which consisted in undivided loyalty and single-hearted service, primarily of the district agents, and secondarily of the boys, to that company. The whole situation was unique. This was not a case of commerce in the ordinary channels of salesmanship. The Curtis Company, by the personal work of their distributing agents, selected boys of tender years, whose work and business was school work, whose time was limited, and whose capacity of salesmanship was restricted to a magazine that sold for 5 or 10 cents, and to a sale of approximately not exceeding 50 copies. Had the magazine been one that sold for 25 or 30 cents, it is quite evident the boys could not have sold it. Were they to try to sell more than 50, it would be at the expense of their school duties, their play time, and the wishes of their parents. There can be no doubt under the proofs that the Curtis Company, in building up this boyselling organization through the distributing district agents, was not throttling or indeed dealing with the ordinary channels of commerce, but was enlarging the sphere of commerce by enlisting in its service the selling power of schoolboys, who, but for this organization, would not only not have taken part in present commerce, but who would have missed the commercial training the Curtis Company alone gave them for future commerce, and the Pictorial Company and the Crowell Company had no hand in giving them, and indeed it seems to us that these companies will, if this injunction here complained of was enforced, succeed in really throttling commerce, by disrupting and destroying an efficient agency which is extending commerce.

[10] Moreover, it is clear that these companies, as well as other publishers, already have full, unrestricted, circulation agencies. The proofs show that the American News Company still continues its general business of distributing the publications of all publishers who choose to use its service; that there are upwards of 400 different magazines which are distributed and circulated solely through its agency and the United States mail, and that its service reaches every retailer of

magazines in the United States. In that regard the proof of the scope of the distribution facilities of the News Company and of their being open to and used by the particular competitors of the respondent, toward whom they are alleged, in this proceeding, to have used unfair business competition by the contract in question, and that the retailers to whom the contract forbids its distributing agents to furnish other magazines can be, and in fact are, furnished with all other magazines, including the magazines of the complaining competitors of the Curtis Company by the American News Company service. All this is shown by the proofs of the Government, in the testimony of witnesses, among whom we quote from Thomas H. Beck, of the Crowell Company, a complaining competitor:

"Q. Will you now describe how the distribution of magazines is made through the American News Company—how do they operate? A. We supply our publications to them, and they distribute them through their branches, and their branches redistribute to retail news dealers. They cover the entire country with that service. * * *

"Q. Have you been able to reach all the retail dealers through the agency of the American News Company? A. Yes; we can reach all the retail news dealers through the American News Company. We can reach them—in other words, you can ship to them, because, if their location and address are known, you can make the shipments. * * *

"Q. Now, you have not depended on the American News Company entirely as a matter of getting your magazines to the people? A. Yes, sir; in the matter of single copy sales, we practically depend on them."

The proofs further show that through these retailers they reach the boy salesmen who get their supplies from these retailers. In that regard, the same witness, speaking of the retailer, says:

"He gets the star edition for sale over his own counter, and gets the boy edition for sale to the boys.

"Q. Do you know of any place or locality where a retailer could not get, through the American News Company, the star edition of the magazine you refer to, and your other magazines? A. I do not."

To the same effect is the testimony of B. A. Mackinnon, circulation director of the Pictorial Review, a magazine published by the Pictorial Company. Mr. Mackinnon's testimony was:

"Q. Is it not possible for any retail dealer in any part of the United States to get copies of your magazines through the American News Company, for sale? A. Yes, sir.

"Q. And it has always been so; is not this the fact? A. As far as I know; yes, sir."

It will thus be seen that the retail dealers in every part of the United States were reached for many years by the Curtis Company and its competitors, and that this service and method of reaching the retailer's customer and of the dealer selling to boy salesmen is now open to and used by the competitors of the Curtis magazines. From this it will be seen that when the Curtis Company, by clause 13, kept its distributing agents from "wholesaling to * * * dealer * * * any periodical other than those published by the Curtis Company * * * without first obtaining the approval of the publishers," they did not

270 F.—58

prevent or hinder such retailer from getting the publications of these other publishers through the American News Company.

It will also be noted that, in dealing with the magazine business, we are not dealing with anything that has been made the subject of monopoly, sole supply, or by deprivation of which the public has been deprived of anything it desires. There is no suggestion in the arguments or proofs in the record that any person who desires any one of the 400 magazines of the country, including these competing magazines, cannot readily get such magazine from any retailer to whom he applies in person, have it regularly delivered to him by a boy salesman who deals with such retailer, or directly from the publisher through the mails. Indeed, the latter agency is the customary one by which we usually get our magazines.

[11] We note these facts, because this freedom of access to the consumer, and the entire absence of monopoly and nondeprivation of the public, have been regarded as an important element in the decision of cases of alleged unfair business competition. Thus in Ford v. Boone, 244 Fed. 341, 156 C. C. A. 627, the Circuit Court of Appeals of the Ninth Circuit says:

"It is to be borne in mind that the plaintiff has no monopoly of the automobile business, but only of one out of almost innumerable kinds of cars, all differing in detail one from the other, but of the same general type, and all designed to be used in the same general manner, and for the same general purpose. If, as was admitted to be the fact in the Motion Picture Patents Company Case, the plaintiff's car were wholly indispensable to the carrying on of a great industry, and if its plan of marketing were such as to constitute an instrument of oppression or favoritism, then the courts should perhaps be astute to discover means by which to disorganize its system and to encourage competitive effort as between the salesmen or distributors of its product; but such is not the case."

Indeed, there is no proof in this record that any harm has been done in the past by the business methods followed by the Curtis Company, nor is there any proof that commerce has been in any way throttled thereby. By this order of the Commission, an injunction is now issued, which, whatever may be said to the contrary, disrupts and forbids continuation of a business course openly pursued for years, and takes away, without compensation, the asset of good will, which cannot be bought with money, but which is the result of years of personal service and loyalty.

[12] Injunction is so drastic and prohibitive a remedy, its issuance by a court of equity so carefully safeguarded, that to have substantial question of the wisdom of such issue often suffices to withhold. To doubt is to decide, and this well-founded principle of equity in itself would lead a court of original jurisdiction to deny the strong arm of injunctive relief. But in this case the foundation of our order is, not doubt, but certainty; for, accepting in their entirety and finality all facts found by the Commission, but taking the whole record and the proofs on which the Commission has made no finding, we are satisfied, as the statute provides, "upon the pleadings, testimony and proceedings set forth in the transcript," the charge of unfair methods of competi-

tion could not be legally adjudged. If this was a case where a trial court had submitted these proofs to a jury from which to find a verdict of unfair business competition, a reviewing court would be constrained to set such verdict aside as not having testimony to support it.

[13] In passing this act and granting to a commission power, in a new and untested field, to issue injunctions which should stop and prohibit commerce, we are of opinion that Congress, in invoking the reviewing supervision of federal courts, experienced in review, meant that those courts should exercise that reviewing power as they had been accustomed to do it theretofore. So viewing the statute, and so examining the whole record, we consider it the duty of this court to make effective the power of "setting aside the order of the Commission" which Congress so enacted.

Let a proper decree be drawn.