## ALUMINUM CO. OF AMERICA v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Third Circuit.    June 1, 1922.    Rehearing Denied
November 22, 1922.)

### No. 2721.

**1. Monopolies ⬄20—Effect of conveyance of business to another corporation, in which competitor purchased stock, to be considered with reference to tendency to create monopoly.**

Under Clayton Act, § 7 (Comp. St. § 8835g), relative to the purchase by a corporation engaged in commerce of stock in another corporation so engaged, where, by agreement between the C. Company and the A. Company, a third corporation was organized to take over part of the business of the C. Company, and the A. Company purchased stock therein, though it was not the corporation engaged in interstate commerce in which stock was acquired, the effect of the transaction with reference to its tendency to create a monopoly, as well as its tendency to lessen competition, must be considered.

**2. Monopolies ⬄20—Statute not directed to acquisition of stock in one corporation by another, but to effect on commerce.**

Clayton Act, § 7 (Comp. St. § 8835g), forbidding a corporation engaged in commerce to acquire stock in another corporation so engaged, where the effect is substantially to lessen competition, to restrain commerce, or tend to create a monopoly, is not directed to the mere acquisition of stock of one corporation by another, but to the effect of such acquisition on commerce.

**3. Monopolies ⬄20—Competition exists between corporations in same business, though there is a "sellers' market."**

Within Clayton Act, § 7 (Comp. St. § 8835g), relative to the purchase by a corporation of stock in another corporation having the effect of substantially lessening competition, competition exists between corporations selling the same class of goods, though there is a "sellers' market," or condition of affairs under which sellers do not have to compete for trade, but where the trade competes for the sellers' products.

**4. Monopolies ⬄20—Competition held lessened when only competitor in certain goods and one of two competitors in others eliminated.**

Competition was substantially lessened, within Clayton Act, § 7 (Comp. St. § 8835g), by a stock acquisition which eliminated from the sheet aluminum trade a company's only competitor in the manufacture and sale of wide sheets, and one of its only two competitors in the manufacture of sheets of any width.

**5. Monopolies ⬄20—Lessening of competition with corporation other than one whose stock was acquired held to have evidential bearing.**

Where, by agreement between the A. Company and the C. Company, a third company, in which the A. Company acquired stock, was organized to take over part of the C. Company's business, though the stock acquired was not that of the C. Company, the lessening of competition with the C. Company had an evidential bearing on the question whether the transaction tended to create a monopoly, within Clayton Act, § 7 (Comp. St. § 8835g).

**6. Monopolies ⬄20—May be created by stock acquisition not lessening competition with corporation whose stock is acquired.**

A "monopoly" can be created, within Clayton Act, § 7 (Comp. St. § 8835g), by acquisition of stock in another corporation, when the effect is not to lessen competition with such corporation, if its effect is to end competition existing elsewhere.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Monopoly.]

---

⬄For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. Monopolies ⬳20—Corporation whose stock was purchased held "engaged in commerce," and potentially engaged in competition with purchaser.**

Where the A. Company and the C. Company, a competitor, agreed that a third company, in which the A. Company was to acquire stock, should be organized and purchase the aluminum rolling mill and rolling mill business of the C. Company, and the new company paid for such business from the proceeds of monthly calls on the other companies' stock subscriptions during a period when it was operating the newly acquired plant, it was "engaged in commerce," and potentially engaged in competition with the A. Company, when the latter company's stock was acquired, within the meaning of Clayton Act, § 7 (Comp. St. § 8835g).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Engage.]

**8. Monopolies ⬳20—Corporation temporarily suspending manufacture held nevertheless engaged in commerce.**

Where a corporation purchased a going business in the manufacture and sale of sheet aluminum, and engaged in such business, it did not cease to be engaged in commerce, within Clayton Act, § 7 (Comp. St. § 8835g), by temporarily suspending the rolling of sheets, while changing from an old mill to a new one.

**9. Monopolies ⬳20—Motive of acquisition of stock in another corporation held immaterial.**

Under Clayton Act, § 7 (Comp. St. § 8835g), the effect of a corporation's acquisition of stock in another corporation as substantially lessening competition, restraining commerce, or tending to create a monopoly, and not the motive for the transaction, is the question for the court, and it is immaterial that the object of the transaction was not to evade the statute, but to increase production and maintain reasonable prices.

Buffington, Circuit Judge, dissenting.

Petition for Review from Federal Trade Commission.

Petition by the Aluminum Company of America to review an order of the Federal Trade Commission. Order sustained.

George B. Gordon, S. G. Nolin, and Gordon & Smith, all of Pittsburgh, Pa., for petitioner.

Francis W. Treadway and Treadway & Marlatt, all of Cleveland, Ohio, for Cleveland Metal Products Co.

Edward L. Smith, Wm. H. Fuller, and Adrien F. Busick, all of Washington, D. C., for respondent.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This is a petition of Aluminum Company of America for review of an order of the Federal Trade Commission commanding that corporation, on a finding that it had violated Section 7 of the Clayton Act, 38 Stat. 730 (Comp. St. § 8835g), to divest itself of all its stockholdings in the Aluminum Rolling Mills Company, another corporation.

The relevant facts, shortly stated, are these:

The Aluminum Company of America (to which we shall refer as the Aluminum Company) is the dominant factor in the aluminum industry. Its business, and that of its subsidiaries, extends to the production and sale of crude or pig aluminum and of aluminum ingots; the production and sale of sheet aluminum rolled from ingots; and the manufacture and sale of articles fabricated from sheets.

During the time covered by this controversy the Aluminum Company produced one-half of the pig aluminum and aluminum ingots made in the world and all that was made in the United States. Its ingot output was 150,000,000 pounds a year. In the domestic field, one substantial competitor—the Southern Aluminum Company, of French affiliation, with a capital of $8,000,000—arose before the war; but during the war it succumbed to financial difficulties and its properties were purchased by the Aluminum Company.

Pig aluminum and aluminum ingots are used for two general purposes, namely; for casting articles and for rolling sheets. From aluminum sheets many things are made, among them kitchen utensils and automobile bodies. The Aluminum Company and its subsidiaries produce one-half of all the sheet aluminum made in the world and, prior to the war, they produced all of the sheet aluminum made in the United States.

In March, 1915, the Cleveland Metal Products Company—of which we shall have more to say presently—built a mill for rolling sheet aluminum of a width of 60 inches and entered the trade in competition with the Aluminum Company and its subsidiaries.

In 1916, the Bremer-Waltz Corporation became a competitor of the Aluminum Company and its subsidiaries in the manufacture of sheet aluminum 30 inches wide. In 1919 this concern sold a part of its physical assets including its rolling mill to the Aluminum Goods Manufacturing Company of whose stock the Aluminum Company owns 36 per cent.

In 1916, the United States Smelting & Aluminum Company became a competitor of the Aluminum Company and its subsidiaries in sheet aluminum of the width of 30 inches.

Thus during the time in question the Aluminum Company had no domestic competitors in the manufacture of aluminum ingots and but three competitors in the manufacture of aluminum sheets, two of narrow sheets and one of broad sheets; the difference in width of sheets being a factor in the breadth of the sheet market; for only broad sheets are used in the manufacture of automobile bodies.

Prior to 1913, there were two corporations doing business in the City of Cleveland, the Cleveland Metal Products Company and the Cleveland Foundry Company, which were owned by the same people. The Cleveland Metal Products Company (hereafter referred to as the Cleveland Company) was engaged in the manufacture of enameled steel cooking utensils, and the Cleveland Foundry Company (hereafter dropping out of the case) was engaged in the manufacture of oil stoves with aluminum parts. These corporations were merged in January, 1917, under the name of the former.

In 1913 the Cleveland Company contemplated the extension of its steel cooking utensils business by adding aluminum cooking utensils. With this in view it took up the matter of rolling its own sheet aluminum from which to fabricate its cooking utensils and stove parts. Its first step was to investigate the sources of raw material. It knew that aluminum ingots could be purchased from the Aluminum Company, the sole domestic source. Its president, however, went abroad and

found that aluminum ingots could be purchased in Europe. Being assured of an ingot supply from the foreign source, the president returned to America and, on his report, the Cleveland Company began the erection of a plant. This plant was completed in 1915 at a cost of $227,000. In order to roll sheets for its own use at a low cost, the mill was constructed on a scale larger than the company's own needs. Its capacity was 250,000 pounds of sheet aluminum a month, of which later the company used 27 per cent. in the manufacture of its products and sold 73 per cent. on the market. Recourse to the foreign market having been cut off by the war, the Cleveland Company obtained ingots from the Aluminum Company, the only available source. From sheets sold on the market (not from sheets used in its own business), the Cleveland Company earned net profits of $23,000 for the six months ending December 31, 1915; $219,000 for the year 1916; and $52,000 for the year 1917. Profits in these substantial amounts were due, it is explained, to several causes: One was that the demand for sheet aluminum arising from the war exceeded the supply; another, that the market price for sheets was fixed by extensive time contracts of the Aluminum Company at a point considerably below what the trade was willing to pay for spot deliveries, and that, the Cleveland Company, declining to make time contracts, was able to sell its product at the higher figures.

When the United States entered the war and was about to fix the price of sheet aluminum (which it did in March, 1918) prices of the upper level began to recede toward those of the lower level and the Cleveland Company found that the "spread" or difference between the cost price of ingots, fixed by the Aluminum Company, and the selling price of sheets, likely to be fixed by the Government, was not sufficient to cover the cost of converting ingots into sheets. Therefore, with a market responding to this situation, the Cleveland Company incurred losses of $14,000 a month for the first two months of 1918, with a prospect of continuance. This condition of actual and impending losses was made more acute by the fact that the Cleveland Company had outstanding a contract with the Aluminum Company for the purchase of ingots running into the future. The Cleveland Company asked the Aluminum Company to relieve it from its contract. The Aluminum Company declined. There followed interviews, discussions, negotiations between the officers of the two companies and, eventually, the development of a plan to meet the difficulty. This plan contemplated the organization of a new corporation to be known as "Aluminum Rolling Mills Company" and its capitalization at $1,000,000, of which $600,000 was to be issued; the sale by the Cleveland Company of its rolling mill and sheet business to the new corporation at a figure somewhat above the cost of the mill; subscription by the Cleveland Company for $200,000 and by the Aluminum Company for $400,000 of the capital stock of the new corporation; and the organization of the new corporation and the operation of the mill by the Aluminum Company. This plan was carried out with an assurance to the Cleveland Company that its needs for sheet aluminum would be cared for at market prices. This is the transaction which the Federal Trade Commission found to be violative of Section 7 of the Clayton Act.

The findings of the Commission were based solely on Section 7 of the Clayton Act (hereafter referred to as "the section"). Hence, this is the only law involved in the case. The applicable provision of the section is as follows:

"Sec. 7. That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce. ☼ ☼ ☼ "

The Aluminum Company, maintaining under recent decisions that it is for the courts, not for the Commission, ultimately to determine, as matter of law, what acts "lessen competition," "restrain commerce," or "tend to create a monopoly" within the meaning of the section, Federal Trade Commission v. Gratz, 253 U. S. 421, 40 Sup. Ct. 572, 64 L. Ed. 993; Curtis Publishing Co. v. Federal Trade Commission (C. C. A.) 270 Fed. 881; Standard Oil Co. v. Federal Trade Commission (C. C. A.) 273 Fed. 478, 17 A. L. R. 389, challenges the Commission's order on several grounds. All are based on the proposition of law, arising from the power of the Congress to enact laws controlling interstate commerce, that before there can be a violation of the section both the corporation acquiring stock and the corporation whose stock is acquired must at the time be engaged in interstate commerce.

[1] Taking up the events in the order of their occurrence, the Aluminum Company's first contention is that this requirement of the section is not met by the phase of the transaction relating to the Cleveland Company because, although that corporation was engaged in interstate commerce, it was not the stock of that corporation which the Aluminum Company acquired. While this is literally true we cannot thus summarily drop the Cleveland Company out of the case. The Cleveland Company was one of two actors in the transaction whose effect on trade the Commission found violated the section. Therefore, we must inquire, as did the Aluminum Company in its briefs, into the effect of the transaction on commerce, not with reference to lessening of competition alone but with reference as well to its tendency to create monopoly.

[2] Clearly, the object to which the section is directed is not the mere acquisition of stock of one corporation by another. It is the "effect" of such acquisition upon commerce. Our first inquiry, therefore, is whether in this case the effect was substantially to lessen competition between the two corporations. The Aluminum Company meets the issue of lessened competition as it bears on the two phases of the transaction, one between itself and the Cleveland Company and the other between itself and the Rolling Mills Company.

[3] As between itself and the Cleveland Company, the Aluminum Company contends there never was competition during the three years the latter concern was rolling and selling sheets, because, it maintains, under the exceptional conditions arising from war, there was always a sellers' market, that is, a market, where, as we understand it, sellers do not have to compete for trade but where the trade competes for

sellers' products. It is hard to believe that the Congress intended that violations of Section 7 of the Clayton Act should be determined according to market movements and that the section may be violated when stock acquisition is made on a buyers' market and not violated when a like acquisition is made on a sellers' market. We are of opinion that the finding of the Commission that there was competition between the Aluminum Company and the Cleveland Company during the period in controversy is supported by the testimony.

[4, 5] The next question is whether the testimony shows that this competition was substantially lessened by the stock acquisition which followed. As the transaction eliminated the Cleveland Company from the sheet trade, manifestly it put an end to competition between that corporation and the Aluminum Company and its subsidiaries. The "effect" of a transaction which ended competition between the Aluminum Company and its one competitor in the manufacture and sale of wide sheets and ended competition between it and one of only two independent competitors in the manufacture of sheets of any width, was inevitably to lessen competition, and to lessen it substantially. Still, the Aluminum Company says, the law was not violated because the substantial lessening of competition was not between the corporation whose stock was acquired and the corporation which acquired the stock. This also is true; but, as every one agrees, the transaction had two parts; one between the Aluminum Company and the Cleveland Company, by which competition between them was ended; the other between the Aluminum Company and the Rolling Mills Company. Violation of the section does not turn alone on a substantial lessening of competition. It turns, in the disjunctive, on the tendency of the transaction "to create a monopoly." For these reasons we are of opinion that the lessening of competition with the Cleveland Company has an evidential bearing on the next question, whether the acquisition of the stock of the Rolling Mills Company by the Aluminum Company tended to create a monopoly. Obviously, while the ending of competition with the Cleveland Company and the acquisition of the stock of the Rolling Mills Company were parts of one transaction, these parts were interdependent and were so intimately related that one cannot be considered without the other.

Passing from the phase of the transaction with the Cleveland Company, which, though engaged in commerce, was not the corporation whose stock was acquired, and coming to the phase where a new corporation was created whose stock, it is contended, was acquired before it began rolling sheets and delivering them in commerce, the Aluminum Company advances the proposition that the latter phase of the transaction does not come within its interpretation of the section that before the law can be violated both the corporation acquiring stock and the corporation whose stock is acquired must at the time be engaged in interstate commerce. In other words, the Aluminum Company maintains that the new corporation at the time its stock was acquired had not begun business and, therefore, could not have been "engaged * * * in commerce." From this premise the Aluminum Company draws the conclusion that the latter phase of the transaction did not violate the section. Continuing argumentatively, it maintains that after

the stock acquisition and when later the new corporation embarked in commerce, it created commerce where none before existed, the effect of which was to increase, not to restrain, commerce; and, as there was no competition between the Aluminum Company and the new corporation at the time of the acquisition of its stock, necessarily "the effect of such acquisition" could not be to lessen competition where none existed. It seems to us that in this defense the Aluminum Company stands on a ledge too narrow for safety. Assuming for a moment that at the time of the stock acquisition the new corporation had not become engaged in commerce because it had not begun rolling sheets and, therefore, had not been in competition with the Aluminum Company, we doubt that the Aluminum Company could be saved from violating the section in view of the next fact that by the terms of the arrangement the Aluminum Company at once put the new corporation into commerce, and put it into commerce in a way which forever prevented competition with itself.

[6-8] But the lessening of competition is not the only effect of the acquisition by one corporation of stock of another which the Congress sought to avoid. It intended as well to prevent a transaction "where the effect" may "tend to create a monopoly," which is the effect which the Commission found in the acquisition of the stock of the Rolling Mills Company. A monopoly can be created by a transaction of stock acquisition when the effect is not to lessen competition with the corporation whose stock is acquired if the effect is to end competition existing elsewhere, United States v. New England Fish Exchange (D. C.) 258 Fed. 732, 746; as for instance the ending of competition with the Cleveland Company. This is for the reason that the lessening of competition and a tendency to monopoly are not always synonymous. There may be a lessening of competition between two corporations in a stock transaction that does not tend to monopoly. But, curtailing this discussion, we are not prepared to admit the premise from which the Aluminum Company deduces its conclusion. In other words, we do not find that at the time the Aluminum Company acquired the stock of the Rolling Mills Company the latter was not engaged in commerce and was not, potentially, engaged in competition with the Aluminum Company, for these reasons:

Prior to February 17, 1918, the Cleveland Company had been engaged in competition with the Aluminum Company. On that day it agreed with the Aluminum Company to organize, and later there was organized, a third corporation, which was to purchase, and later did purchase, the aluminum rolling mill and also the "aluminum rolling mill business" of the Cleveland Company. This finding of the Commission is sustained by the record which includes an agreement between the two old corporations for sale by the Cleveland Company to the new corporation not of its rolling mill alone but its accounts receivable, and providing also for the delivery to the new corporation of a list of the Cleveland Company's customers scattered through many states, and for the taking over by the new corporation of all "unfilled orders" for aluminum sheets on the books of the Cleveland Company.[1]

[1] Record, pp. 750, 151, 511, 512, 526 to 644, 645, 649, 653, 654, 655, 660, 661, 673, 674, 696 to 707, 711 to 718, 194.

The "business" thus sold by the Cleveland Company and purchased by the new corporation was that of a going concern consisting of the manufacture and sale of sheet aluminum in commerce and in competition with the Aluminum Company. Settlement with the Cleveland Company for the purchase of these assets was not made at the time with money acquired by the new corporation from previous sale of its stock, but was made by six notes given by the new corporation payable monthly, and the notes were met from the proceeds of six monthly calls upon the Cleveland Company and the Aluminum Company to meet their stock subscriptions. During the period through which these payments were being made and stock subscriptions were being paid, the new corporation had begun the operation of the newly acquired plant and continued its operation until the mill was moved to a new location. Later, during the change from the old mill to the new, doubtless the rolling of sheets was suspended. Yet it does not follow that the relation of the new corporation to the trade which it had purchased and in which it had been engaged was also suspended, and that, in consequence, the new corporation was not engaged in commerce within the meaning of the section. Having purchased trade upon which to start, and having started upon the trade it had purchased, the new corporation was, we think, truly engaged in commerce at the time of the stock acquisition.

[9] In addition to the several defenses made by the Aluminum Company there is much in the record to the effect that the need of aluminum for purposes of war and the assistance rendered the allied governments and our own government by increasing production and maintaining reasonable prices entered into the transaction. For these reasons and others it is persuasively urged that the arrangement was not a device intended to get around the Clayton Act but was a plain business transaction having the twofold object of relieving one party from a difficult business situation and enabling the other party to meet more effectively the demands of war. With these matters, we surmise, we have no present concern. They have to do with the motive for the transaction. We have to do only with the "effect" of the transaction; and with its effect only as it may "substantially lessen competition * * * or restrain commerce, * * * or tend to create a monopoly." As we are not called upon to determine whether the Aluminum Company is a monopoly within the definition of the Anti-Trust Law (Comp. St. § 8820 et seq.), we limit our decision to the question whether, within the policy of the Clayton Act, the transaction comes within the definition of the section. In this we are of opinion that it does, and that its effect upon actual competition as well as in destroying potential competition in a way later to make actual competition impossible was substantially to lessen competition between the corporation whose stock was acquired and the corporation making the acquisition; and second, that without regard to whether its effect was substantially to lessen competition between these two corporations, the stock acquisition did, in effect, "tend to create a monopoly."

Being of opinion that the findings of the Federal Trade Commission are supported by the testimony, its order is sustained.

BUFFINGTON, Circuit Judge (dissenting). This case involves the construction of the first clause of section 7 of the Act of October 15, 1914, and its application to the facts disclosed by the proofs. That act, being "An act to supplement existing laws against unlawful restraints and monopolies, and for other purposes," was supplementary to existing laws against unlawful restraints and monopolies. The paragraph in question is:

"No corporation engaged in commerce shall acquire directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

These plainly expressed provisions contemplate the existence of two corporations which are competitors in the same line of business, and one of them, with the view to substantially lessening competition, or creating a monopoly, buying the whole or a part of the stock of its competitor. That two existing competing corporations were the subjects of the clause, is shown plainly by its terms. The offending buying corporation is aptly described as being in business, by the words "no corporation engaged in commerce," and the other corporation is described as being in like manner engaged in commerce by the words "another corporation engaged *also* in commerce," and that the two corporations thus described were each actually engaged in competition of a substantial character, is evidenced by the fact that the stated object of the law was to prevent the two corporations engaged in commerce from doing a thing "the effect of which was to *substantially lessen* competition," or which tended "to create a monopoly of any *line of commerce.*" Moreover, the word "acquire" is an apt one to describe the buying by one corporation of the stock of another competing corporation, as will be seen by reference to the proviso in the third paragraph that "this section shall not apply to corporations *purchasing such stock* solely for investment and not using the same by voting or otherwise to bring about, or any attempt to bring about, the substantial *lessening of competition,*" and also by reference to section 11 of the act (Comp. St. § 8835j), where the remedy against the stock-acquiring corporation is "to cease and desist from such violations and *divest* itself of the stock held." Such divesting would restore the competitive corporation to its former competing status.

Clearly, such was the situation to which this section was directed, but lest the stock of two or more corporations thus engaged in competition, should be bought up not by one another, but by a holding company which was not engaged in commerce, the next paragraph was added, which provided:

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be to substantially lessen competition between such corporations, or any of them, whose stock or other

share capital is so acquired, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

A study of this latter paragraph clearly shows it contemplated two sorts of corporations, viz. one class engaged in competitive commerce with each other, viz. "two or more corporations engaged in commerce," the acquisition of whose shares "may be to substantially lessen competition between such corporations," or "to restrain such commerce in any section or community," or "tend to create a monopoly of any line of commerce." The other or stock-acquiring class of corporation was not described as engaged in commerce, but was described without any limitation by the inclusive words "no corporation shall acquire," etc., thus clearly referring to a mere holding corporation.

In my judgment, the first-quoted clause of section 7 was a case unlike the present, where there was not only no competing corporation buying a competing company's stock, but where there were no elements or purpose of oppression, bad faith, increase of product price, diminution of output, or any other of the vicious earmarks of monopoly or lessening of competition, and where, indeed, the uncontradicted evidence is that the whole transaction was influenced by a patriotic war purpose to increase the supply of aluminum, which the government was then largely absorbing for war requirements at its own fixed price. The business problem which confronted those concerned in the transaction was simply this: The Cleveland Foundry Company, whose major business was making stamped steel and enameled vitreous utensils, built in 1915 a mill to roll aluminum sheets for its own use. When the abnormal war demand for aluminum stopped, the mill began to lose $500 a day. This necessitated either mill abandonment or mill enlargement. At this point, I remark that if the Aluminum Company of America, which furnished the Cleveland Company with aluminum ingots, desired to lessen competition or to broaden the monopoly of rolling aluminum sheets, all it had to do was to do nothing and allow the losing mill to drop out of business. On the other hand, if it desired to continue the mill as an ingot consumer and to increase the production of aluminum sheets, its only course was to enlarge the mill and increase its product. Such enlargement the Cleveland Company, after its disastrous venture, was unwilling to make itself, but was willing to contribute a minor part if the Aluminum Company would contribute the major part of the funds to enlarge.

What was really done was that the Aluminum Company formed a new company, and by taking the major stock thereof made the new company a subsidiary company of its own; the Cleveland Company becoming a minority stockholder, its mill being taken in part payment for such minority stock. Such was the simple business proposition; a losing plant, enlargement, and increased product; the Aluminum Company forming a subsidiary to take over and enlarge the business, and the Cleveland Company contributing the mill and the minority of the money needed to effect enlargement. In point of fact, the situation was in no respect different than it would have been had the Aluminum Company bought the losing mill from the Cleveland Company and itself furnished the entire funds to capitalize the new subsidiary com-

pany.   In my judgment, the present situation did not fall within the terms of either of the quoted paragraphs, was not an acquisition of stock such as the Act contemplated, or one over which jurisdiction was conferred on the Trade Commission by the act.   Nor does the construction which is thus given the act, create a remediless situation, for manifestly, if wrong was done, if this transaction was a subterfuge to lessen competition or to create monopoly, the existing trust laws would have applied.   And, indeed, the District Court of the United States for the Western District of Pennsylvania having theretofore taken jurisdiction of a bill filed by the United States against the Aluminum Company of America, the Attorney General, by proper proceeding in that case, could have and can now prevent that company taking this step, if it tended to lessen competition or create a monopoly.   And this prior, general, and effective jurisdiction of courts over such matters, Congress recognized when it created a Trade Commission of defined and limited power, by providing in the act:

"This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition," and at the same time making it clear "That nothing in this section shall be held or construed to authorize or make lawful anything heretofore prohibited or made illegal by the antitrust laws, nor to exempt any person from the penal provisions thereof or the civil remedies therein provided."   Comp. St. § 8835g.

Being of opinion the case was one to which the limited jurisdiction of the Trade Commission was not extended by the act of Congress, I respectfully record this my dissent.