## BAUSH MACHINE TOOL CO. v. ALUMINUM CO. OF AMERICA.
### No. 450.

Circuit Court of Appeals, Second Circuit.
July 9, 1934.

See, also, 60 F.(2d) 586; 63 F.(2d) 778.

Cummings & Lockwood, of Stamford, Conn., and Edward C. Park, of Boston, Mass. (Mark W. Norman, of Darien, Conn., Edward C. Park, of Boston, Mass., and William A. Kelly, of Stamford, Conn., of counsel), for appellant.

Edward F. McClennen, of Boston, Mass., William Watson Smith, of Pittsburgh, Pa., Frederick H. Wiggin, of New Haven, Conn., Frank B. Ingersoll, of Pittsburgh, Pa., and Edward Williamson, of Boston, Mass., for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This case was tried before a jury, and the issues raised were submitted to the jury, which found a verdict for the appellee. The appellant, complaining of errors in the exclusion of evidence and in the charge of the trial court, appeals.

Appellee, a Pennsylvania corporation, is engaged in producing aluminum alloys, including an alloy known as duralumin, and in fabricating sheet, rods, tubing, forgings, and other products from such alloys and aluminum. It sells such alloys and fabricated products in competition with the appellant throughout the United States. Duralumin, produced by the appellant, is composed of 4 per cent. copper, .6 per cent. manganese, .5 per cent. magnesium, .1 per cent. chromium, and the balance aluminum of a purity described as 99 plus. Appellee's duralumin contains 4 per cent. copper, .5 per cent. magnesium, .5 per cent. manganese, and the balance 99 plus aluminum. Duralumin is a strong alloy of aluminum having a tensile strength of mild steel and 36 per cent. of its weight. Other strong alloys are manufactured by the appellee. Appellant also made what was termed "modified duralumin." Both made pure aluminum sheets, or commercially pure, 99 per cent. or better. The primary business of the appellee is the production and sale of aluminum. Thus engaged in the production of aluminum alloys, they were in competition. In producing that metal, appellee mined bauxite, the ore from which aluminum is made, refined it into aluminum oxide, and then reduced the composition into aluminum by electrolytic process. The electricity for this is generated by hydroelectric power plants, and therefore water power plants and water power rights are valuable assets. Ingot aluminum thus made is either sold in that form or fabricated into the products referred to. Fabrication process is carried further in other plants to finished products, such as kitchen utensils and household wares. Appellee sells its own products and the products of its wholly owned subsidiaries. These subsidiaries include companies performing the operations referred to; the only direct manufacturing operations of the appellee being the reduction of aluminum at three plants. A fourth reduction plant was operated by a subsidiary, the Carolina Aluminum Company. Prior to June, 1928, the appellee owned a large number of subsidiaries in foreign countries. May 31, 1928, it caused to be formed Aluminum, Limited, a Canadian corporation and caused to be transferred to it all its foreign interests.

Aluminum is a basic metal in appellant's products. Dealings in this metal by both necessarily occurred, and because of the acts complained of this controversy developed. Appellant charges that appellee monopolized commerce in aluminum among the several states, and that appellee has attempted to monopolize commerce in aluminum alloys and aluminum products, and that products are sold at a price which would yield no profit to any manufacturer who purchased aluminum at the monopoly price fixed by the appellee. Moreover, it charged that prices were fixed at an artificial level, above prices yielding a fair and reasonable profit over the costs of production and above the prices which would have existed in a fair and competitive

market. Its complaint is that these conditions in both the aluminum and the duralumin markets were bound to and did cause damage to it. Appellee and its wholly owned subsidiary, the Carolina Aluminum Company, are the sole producers of virgin aluminum in the United States. The appellant claims the appellee expanded by the acquisition of substantially all of the commercially available bauxite deposits in the United States and by the suppression of independent attempts to enter upon the production of aluminum. The trial court excluded evidence offered in substantiation of this charge, and appellant complains of this ruling.

The appellee is the largest producer of aluminum in the world, and Aluminum, Limited, is the second largest. Four foreign corporations, one British, one French, one Swiss, and one German, located selling agencies in the United States in competition, but their importations were relatively small. The significance of this is of primary importance because of the past relations between appellee and these corporations. The appellee had been associated with the British and the French companies in the ownership of a Norwegian corporation and with the French company in the ownership of another smaller French company and an Italian company. The appellee with the Swiss corporation, and the French corporation had formed a Spanish corporation.

The principal European producers were members of a cartel, an association which could limit competition. In 1912, the Northern Aluminum Company of Canada, a subsidiary of the appellee, entered into an agreement with the French company, the Swiss company, the British company, two other English companies, and an Italian company to form an association, the object of which was to regulate and control the sale of aluminum outside of the United States. It was not clearly shown whether or not this organization continued after the World War. There was, however, an aluminum association in existence until 1931 of which the appellee denies it was a member. After organizing Aluminum, Limited, the appellee no longer engaged in foreign trade. Aluminum, Limited, did not compete in the United States. In addition to that fact, there was substantial evidence to indicate that the two organizations were treated as a unit. The appellee from 1925 to 1931, inclusive, controlled from 85 to 95 per cent. of the supply of aluminum in this country, whether produced here or imported, and it controlled approximately 90 per cent. of the bauxite of the United States, whether mined here or imported. From this large percentage of control it was argued that the jury might have found power to control and the actual control of prices. Moreover, it was shown that prices were constant for long periods at levels far above cost plus a normal profit from which the jury might say there was monopolization within the statute. 15 USCA § 2. Besides the claimed monopoly in aluminum, the appellant also offered evidence showing appellant's policy of selling duralumin at prices which would eliminate the possibility of a producer, in appellant's position, making a profit if it were forced to purchase aluminum at the prevailing prices.

The appellant offered in evidence contracts and agreements entered into between the appellee and various corporations before the present controversy arose. These corporations were engaged in the same industry as appellee or owned large deposits of bauxite or water rights. The contracts provided for the absorption of these corporations or the acquisition of their assets by the appellee. In some instances, the contracts contained clauses restricting the transferors from engaging in a similar or competing business. Also it offered in evidence an agreement between the earlier Canadian subsidiary and the Swiss company whereby certain countries were selected and each covenanted not to sell in each other's territory. A clause of that contract provided that "The Northern Aluminum Co. engages that the Aluminum Company of America will respect the prohibitions hereby laid upon the Northern Aluminum Co." Although the appellant contended the evidence was material, since it was attempting to show by this evidence the elimination of all possible competition, the court excluded it on the ground that it bore only on intent which the court held to be a collateral matter. Intent may well be more than a collateral matter. United States v. Corn Products Refining Co. (D. C.) 234 F. 964, 1013. It was error to exclude the evidence showing the purchase of the stock and assets of the other corporations, even though the transactions occurred long before the injury complained of. Monopolies are frequently attained by the acquisition of the controlling interest in one corporation after another. Standard Oil Co. v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663; Aluminum Co. of America v. Federal Trade Comm., 284 F. 401 (C. C. A. 3). Although the acquisi-

tion of itself is not illegal, the stifling of competition by the application of the concentrated power is. United States v. Eastman Kodak Co. (D. C.) 226 F. 62. The appellant should have been permitted to show that the absorption of these smaller domestic corporations had created a monopoly even though the transaction had occurred before the present controversy arose. The history of the organization throws light upon its illegality. The conduct of persons, agreements, and acts done preceding the vesting of power may show monopoly, and these acts may be weighed although they occurred prior to the injury. Chicago Bd. of Trade v. United States, 246 U. S. 231, 38 S. Ct. 242, 62 L. Ed. 683, Standard Oil Co. v. United States, supra.

█ It was shown that Aluminum, Limited, sold large quantities of metal for delivery in the United States, but to the appellee, and not in competition with it; 10,000,000 pounds were sold in May, 1929, at 22¼ cents per pound for 99 grade ingot, duty paid, and 42,000,000 pounds in October, 1929, at 20 cents per pound for the same grade, duty paid. The price quoted by the appellee for this grade in 1929 was 24.3 cents. Subsidiaries of Aluminum, Limited, obtained alumina from a subsidiary of the appellee in large quantities in 1929 and 1930, just as they did prior to June, 1928. The price charged Aluminum, Limited, for alumina was the same price which the appellee's subsidiary charged the appellee.

Appellee transferred its foreign selling agencies to Aluminum, Limited, and then ceased to compete outside the United States. The appellant argues that, had not the issues been submitted to the jury in the restricted manner hereafter referred to, the jury might have found that the appellee and Aluminum, Limited, were parts of the same organization, corporate instrumentalities, though separate in form, owned and controlled by the same small group of men, who preferred to cause Aluminum, Limited, to sell in foreign markets and to exclude that organization from the markets of the United States in order that the appellee might sell here at a higher price per pound. Aluminum, Limited, entered into a written agreement with the British, French, German, and Swiss companies with respect to the Japanese market and with the British company with respect to the Indian market with the same monopolization in mind.

Appellant purchased exclusively from foreign producers from 1925 to 1931, inclusive. During the six years just preceding the date of this suit (July, 1931), it bought and paid for 4,055,904 pounds. By analysis, the appellant showed that throughout it paid for metal a price which it claimed was unnecessarily high, considering the cost and reasonable profit, and that it was obliged to do so because of the domination and control by the appellee of the aluminum market. It also claimed damages sustained by reason of cutting the prices of aluminum alloys. There was evidence from which the jury might reasonably conclude that there was a fixity of price made and controlled by the appellee from which the appellant suffered damages.

█ Appellant's claim for damages is based upon the claim that the appellee had a monopoly. It was obliged to prove injury by the monopoly. It first attempted to show there was in fact a monopoly, and, for this purpose, evidence was admissible to show the conduct of persons in control and agreements and acts done preceding the vesting of power. Such evidence could be considered, although the acts occurred prior to the injury. To exclude this evidence was error. Nor should the appellant have been restricted to the introduction of evidence relating to transactions with domestic corporations. Relations with foreign corporations were admissible also for another reason. A monopoly within the United States created by contract or agreement with foreign corporations is unlawful. United States v. American Tobacco Co., 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663. The contracts entered into by the appellee and the appellee's subsidiaries with foreign corporations and the purchase of stock in these foreign corporations were admissible for the purpose of showing a tacit understanding not to compete. Although the court indicated that the jury could find that an agreement existed between the appellee and the foreign corporations without finding an express agreement, portions of the charge completely limited the scope and effect of that instruction, for the court ruled that evidence of such agreement must be found in the testimony of Haskell, appellant's president, charging:

"* * * I have been constrained to rule that the circumstantial evidence in this case is insufficient to constitute independent evidence of an agreement between the defendant and the foreign producers, speaking now of the foreign producers exclusive of Aluminum Limited, the Canadian concern. It results that if there is anywhere in the case evidence of an agreement, independent evidence of an agreement between the defend-

ant and these foreign producers, it must be found in the direct testimony of Mr. Haskell. * * * "

The evidence of uniformity of prices in the United States which the appellee and the foreign producers charged over the period from 1919 to 1931, inclusive, under the circumstances, as the evidence disclosed, might well support a finding by the jury of an agreement between the appellee and the foreign producers. This issue should have been submitted to the jury irrespective of belief or disbelief of Haskell's testimony. Conspiracies are seldom capable of proof by direct testimony and may be inferred from the things actually done and from the circumstances. Frey & Son v. Cudahy Packing Co., 256 U. S. 208, 41 S. Ct. 451, 65 L. Ed. 892; United States v. Schrader's Son, Inc., 252 U. S. 85, 40 S. Ct. 251, 64 L. Ed. 471; Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U. S. 600, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788. The evidence presented by the appellant should have been submitted without the restriction contained in the charge quoted, for it showed the past mutual undertakings and stock transactions between foreign producers and the appellee and its subsidiaries. It showed the past close relationship from which might be implied, together with other evidence, a mutual understanding not to compete and to maintain fixity of price. Moreover, the relationship of Aluminum, Limited, with the appellee and the holdings of Aluminum, Limited, in the foreign corporations, were items not to be disregarded. Aluminum, Limited, on its organization had transferred all of its shares to the appellee in exchange for all of the foreign business and holdings of the appellee. The appellee distributed these shares to its stockholders. In December, 1931, control of a majority of the shares of this corporation was in the hands of four men of prominence in appellee's organization—its chairman of the board of directors, its president, a director, and a large stockholder of the appellee. Numerous other officers of the appellee also held stock in Aluminum, Limited. Although such a relationship would imply the dictation of the policies of Aluminum, Limited, by its controlling bodies, and therefore an order rather than an agreement not to compete in the United States, that implication does not negative the fact that the close relationship of the two competitors might carry with it a tacit agreement between the two corporations proper not to compete with each other. Nor does it eliminate the possibility of an authorization of the off-

spring, by the appellee, to arrange for the distribution of available markets with foreign producers. Juries are allowed to act upon probable and inferential as well as direct proof. Story Parchment Co. v. Paterson Paper Co., 282 U. S. 555, 51 S. Ct. 248, 75 L. Ed. 544.

It is not necessary that the authorization of Aluminum, Limited, or an agreement between the appellee and Aluminum, Limited, be express and formal to be found illegal. If it were necessary, acts otherwise illegal could be made legal freely. The appellee may not so easily avoid the statute. See United States v. Northern Securities Co., 120 F. 721 (C. C. Minn.); Id., 193 U. S. 197, 24 S. Ct. 436, 48 L. Ed. 679. It is sufficient if the directors of the two corporations understood the arrangement. Moreover, when, in addition to these circumstances, there is added the testimony of Haskell, it was incumbent upon the trial judge to submit all the evidence to the jury, and it was for the jury to say whether or not there was the control and domination charged. The fact that the jury were disinclined to believe Haskell's testimony has not been lost sight of, but it should be considered that the jury was directed to consider Haskell's testimony by itself. If the evidence produced by him was considered along with the corroborating evidence, the jury might find differently. The instructions to the jury which directed that the jury would have to find for the appellee if they found no agreement in effect between appellee and the foreign producers or between appellee and Aluminum, Limited, to control the price of aluminum or to restrain competition in the United States was erroneous. Standard Oil Co. v. United States, supra; 15 US CA § 2.

The fact that the appellant could obtain the metal from other sources—scrap metal or by purchase from foreign producers— does not make the appellee's control of the market any less a monopoly. Straus v. Victor Talking Machine Co. (C. C. A.) 297 F. 791. If there was domination and control of the market in the United States and appellee suffered injury, proximately caused by these illegal acts the jury might award damages. Story Parchment Co. v. Paterson Paper Co., supra. And appellant was entitled to a jury's determination of whether in fact there was this illegal domination and control and stifling of competition. The evidence referred to was admissible for the jury's consideration as tending to show that competition was being stifled and prices fixed.

The appellant offered in evidence an agreement between the appellee and the General Chemical Company, dated July 25, 1905, by which appellee acquired shares of the General Bauxite Company and undertook to supply the General Chemical Company with Bauxite over a period of fifty years; the latter covenanting not to use or to permit bauxite to be sold to it to be used for conversion into aluminum. This evidence should have been admitted. It tended to show a combination to monopolize in violation of the statute when considered with the other testimony in the case, showing the history of the appellee and its course of conduct. It supported the charge that the appellee's monopoly had been formulated by acquisition of substantially all commercially available bauxite deposits within the United States and by suppression of independent attempts to enter into the production of aluminum. Standard Oil Co. v. United States, supra; United States v. American Tobacco Co., supra. By reason of the same rule and for the same purpose, it was error to exclude Exhibit 261 for identification. The exhibit consisted of an agreement between the president of the appellee and James B. Duke, dated April 15, 1925, by which they agreed to cause a merger of the appellee with a company to be formed which should hold certain water rights on the Saguenay river in Canada. It was also error to exclude the exhibit which showed the agreement between the appellee and the Canadian Manufacturing & Development Company of July 9, 1925. This was part of the merger planned which was consummated.

These errors to which we have called attention sufficiently show that the appellant did not have a fair trial and that the case must be retried. At the new trial, the appellant should be permitted to show what was the differential or spread between the price of ingot and that of sheet of various gauges, both flat and coil, made by the appellee in its price lists and that the spread was insufficient to enable appellant to operate without a loss. Baush Machine Tool Co. v. Aluminum Co. of America, 63 F.(2d) 778 (C. C. A. 2).

We need not consider other errors alleged to have been made in the charge, for upon the new trial, the principles we have announced should avoid the commission of such error. The jury should be informed that the appellant might recover damages to its business caused by unfair price fixing if such price fixing precluded the possibility of profitable operation by the appellant and if it was done for the purpose of creating a monopoly.

Baush Machine Tool Co. v. Aluminum Co. of America, supra.

Judgment reversed, and new trial ordered, with costs.

SWAN, Circuit Judge, concurring in opinion.

SWAN, Circuit Judge.

I concur in the result. Restraint of trade was charged both in keeping unreasonably high the price of aluminum ingots and in unreasonably reducing the price of aluminum alloys, with the result, as the plaintiff alleges, that it could make no profit. The failure to submit to the jury the second branch of the complaint was an error which in my opinion requires reversal.

As to costs, I would allow the appellant but half the cost of printing the record because of its unnecessary prolixity. See Kynerd v. Hulen, 5 F.(2d) 160, 162 (C. C. A. 5).